Shea *v.* Mabry.

## SHEA *v.* MABRY *et als.*

1. DEPOSITIONS. *Notice.* The clerk having determined to whom notice should be given under sec. 3850 of the Code, failed to give notice of the order to the adverse party. *Held,* that sec. 4423 of the Code was merely directory, and the neglect of the clerk would only entitle the party to cross-examine, and would not operate to vitiate or exclude the deposition.

2. ORDER. *Nunc pro tunc.* An order *nunc pro tunc,* reciting many facts, ought to be grounded upon the clearest evidence, such as the recollection of the presiding judge, or some memorandum kept by him, or the agreement of opposing counsel.

3. DEPOSITION. *Exception.* Exception to a deposition because it refers to and adopts a former deposition, comes too late after the commencement of the trial.

4. SAME. *Practice.* Where objections to a deposition are placed upon untenable grounds, although the evidence is clearly incompetent, the Supreme Court will not consider the objection if first raised there.

5. DIRECTORS. *Duties and liabilities.* Directors of corporations are not mere figure-heads, they are trustees for the company, for the stockholders, and for the creditors. They must not only use good faith, but also care, attention, and circumspection in the affairs of the corporation, and particularly in the safe keeping and disbursement of funds committed to their custody and control. They must see that the funds are appropriated as intended to the purposes of the trust;

and if they misappropriate them, or allow others to divert them from. these purposes, they must answer for it *individually*. Ignorance will not excuse when they have the means of knowledge.

## FROM KNOX.

Appeal from the Chancery Court at Knoxville., O. P. TEMPLE, Ch.

BAXTER & CORNICK for complainant.

BROWN, HENDERSON, WEBB & PROSSER for defendants.

H. H. INGERSOLL, Sp. J., delivered the opinion of the court.

This cause was before this court in 1873 on appeal from the decree of the Chancellor sustaining the demurrer of defendants and dismissing the bill, the allegations of which are that complainant is a judgment creditor of the Knoxville and Kentucky Railroad Company for labor done as a contractor in constructing the road, with *fi. fa.* returned *nulla bona,* that the defendants were the board of directors of said company, Mabry being the president, and as such were the trustees of the funds loaned and paid to said road for the purpose of its construction and equipment, of which were more than two and a quarter million dollars of State bonds, and nearly four hundred thousand dollars from other sources; that this was enough to construct and equip said road and leave a large surplus; that nearly all of these funds had come into the hands of defendants, who, instead

Shea v. Mabry.

suance thereof complainant took the depositions of thre witnesses, Moses, the secretary and treasurer of e company, and Sanford and Ludlow, two of the d ctors not sued in the cause, and they were filed D r 14, 1874, without cross-examination. After-w , date not given, all the respondents, save Mabry, except to them for want of notice, and the master enters thereon, also without date, ."Exceptions sustain ." No prayer for an appeal therefrom appears on the deposition or elsewhere in the record, save as hereinafter shown.

On the 16th of January, 1875, by order on the minutes, the cause appears set for hearing on March 16, 1875. On this day an order was made continuing the cause, and complainant, who had probably meanwhile learned of the sustained exceptions to his depositions, is granted leave to retake the same on giving notice to Mabry and two others, which it was ordered should be notice to all. The master was also directed to keep a copy of this order in the file. On the 3d of May following, complainant, on due notice as per order, retook the depositions of said witnesses. But instead of re-examining them upon the original interrogatories, or interrogating them anew on subject matter, the following, which is substantially same in each case, is the whole body of the deposition:

"Question. Please examine the deposition made by you heretofore and filed in the case December 14, 1874, and now shown to you, and say if the same is true in all its statements?"

"Answer. I have examined the deposition. It is, to the best of my knowledge and belief, true in all its statements."

Some other depositions were taken, and documentary evidence filed for complainant, but his most important proof was contained in the original depositions of Moses, Sanford and Ludlow, without which his suit must certainly fail.

When the cause was called for hearing at the October term following, an order was entered therein as follows:

"It appearing to the court that the defendant (complainant) appealed from the decision of the master sustaining the defendant's exception to the deposition of John L. Moses, E. J. Sanford, and J. R. Ludlow, taken on behalf of complainant and filed in this cause on December 14, 1874, that complainant's said appeal came on to be heard on the — day of March, 1873, and on said hearing it appeared to the court from inspection" that notice was given as required by said order on the rule docket, and said depositions accordingly taken; "but because it further appeared that a copy of said order had not been placed among the files as required by the statute in that case made and provided, the court confirmed the master's decision and sustained defendant's exception to said depositions. And it further appearing that no entry had been made of record showing the foregoing facts, it is now ordered by the Chancellor, on application of complainant, that the order be entered now for then. To all which the defendants except, and tendered their

bill of exceptions, which was signed, sealed, and made part of the record in this cause."

The bill of exceptions shows:

"That the evidence upon which the entry *nunc pro tunc* was made, was the verbal representations of the complainant's solicitor, that the statements in said entry as to what occurred at a previous term of the court are true, and the distinct recollection of the court that the question which said entry states was raised by the exception, . . . was before the court at a former term upon appeal from the action of the master . . . in some case, and a strong impression that . . . it was in this case; the truth of which statements in said entry *nunc pro tunc* . . . the solicitors of defendant denied, and their recollection in regard thereto was supported by that of the clerk and master, who stated that the case in which said question was brought before the court . . . was another case, and that no appeal had ever been taken from his action in sustaining the exceptions of defendants in this case."

The cause was then heard, and on the hearing complainant offered to read said first depositions of Moses, Sanford and Ludlow, "as a part of or exhibits to their depositions, filed May 8, 1875; but on objection being made by defendants upon the ground that said depositions were not filed with or made part thereof, and could not be read, being no part of the record in this cause, the court sustained said exceptions, and excluded said depsotions of December 14, 1874, as against all the defendants except Joseph A.

---

---

Mabry, . . . to all which complainant excepts."
"And defendant Mabry also excepted to those portions
of the deposition of John L. Moses purporting to give
extracts from and the contents of the record and min-
utes of the railroad company, upon the ground that
the records were available, and were better evidence;
but the court overruled said exceptions, and admitted
said evidence, to which defendants excepts." And
thereupon, argument of counsel being heard, and the
court being of opinion that complainant had failed to
sustain the allegations of his bill by proof, decreed
that it be dismissed, and complainant has appealed.

At a former term the cause was argued, and, on
consideration, the Chancellor's decree was affirmed, but
for satisfactory reasons a rehearing was ordered, and
re-argument has been made at the present term.
Many questions of practice arise in the record, the
decision of which is pressed upon us with so much
earnestness by counsel that we conceive it proper, if
not necessary, to give them consideration.

1. Complainant insists that the exception to the
original depositions of Moses, Sanford, and Ludlow
were not well taken, and should not have been al-
lowed.

Section 3850 of the Code provides:

"In all cases in which more than one person is
plaintiff or defendant, the court or clerk may deter-
mine whether notice shall be given to each person,
and if not, to whom notice shall be given, a memo-
randum of the order being kept among the papers."
And section 4423 requires the master to give notice

to the adverse party or his solicitor of any "rule, order, or proceeding taken at his office affecting such party."

Clearly, it was the duty of the master to give notice to defendants of the order made by him in this cause to serve notice on only one of them, and also to preserve a memorandum thereof on file. But these were not essential to the validity of the order or notice in pursuance of it. The statute is directory merely, and the neglect of the master would only entitle the defendants to an order to cross-examine; it would not operate to vitiate or exclude the depositions.

But defendants insist that there was no appeal from the action of the master, and therefore his decision, though erroneous, was conclusive. Such is the law—1 Heis., 352—but how is the fact? Complainant's counsel asserted that he had appealed, and the Chancellor made an order *nunc pro tunc* reciting the appeal and his affirmance of the clerk's decision six months previous. But respondents insist that after adjournment the Chancellor had no power to make a *nunc pro tunc* order. We do not so decide; but we are clearly of opinion that the order in this cause was not safely grounded, as appears from the record. Certainly such an order, containing a recital of so many facts, if it can be made at all, at a subsequent term, ought not to be entered except upon the clearest evidence, such as the recollection of the presiding judge, or some memorandum by him or the clerk, or, perhaps, a solicitor under his order, or the agree-

ment of opposing counsel that the order was made and inadvertently omitted to be entered. Here the Chancellor allowed the verbal representations of complainant's solicitor, aided by his own mere impression, to prevail over the denial of the counsel for respondents and the statement of the clerk and master to the contrary, and also the persuasive and convincing fact that at the very time, *tunc*, for which the order was made, complainant had taken an order to retake these very depositions, and to prescribe the manner of notice, and also to require the master to keep a memorandum on file, thus seemingly submitting to the action of the master in sustaining the exception and waiving his right of appeal. Had he taken the appeal and the Chancellor held against him, it is difficult to see how he could have omitted the recital of the fact and the adverse decision in the order immediately preceding the leave to retake the depositions.

We do not clearly see why complainant did not appeal at the time this *nunc pro tunc* order was made, and would be inclined to treat these recitals of former action as an action at that time by the Chancellor, but for the fact that we infer that this was made after the commencement of the hearing, and therefore too late, under our statute, to make formal objections or call for decision upon those previously made. Certain it is, these depositions had been excluded as to all but Mabry, and were so regarded by all, and were not offered to be read by complainant as original deposition on the hearing.

2. But they were offered to be read as parts of

or exhibits to the second depositions, and on objection excluded by the Chancellor. This, complainant insists, was erroneous, because, in fact if not in form, the first were, and were intended, by the witnesses and complainant, as parts of the second; and respondents, having notice of the order to retake, and also of the time and place of retaking these depositions, must have known that complainant so regarded them, and as such intended to offer them at the hearing, though in fact they were not actually exhibited with or annexed to the new ones as parts thereof.

If for this informality only the Chancellor overruled complainant's application and excluded the original depositions, we cannot hesitate to say it was error. There is no particular charm in the words "hereto annexed" or "herewith exhibited," by the use or omission of which suits are to be gained and fortunes lost; and it would certainly seem sufficient if the paper referred to was on file and sufficiently identified by description, as is done in this case clearly.

But it is said that it was not so much for this technical defect in the depositions as because of the manner of retaking that the Chancellor excluded the original depositions; and that even if they had been attached to or exhibited with the second depositions they would have been inadmissible. To support this view we are referred to the cases of *Shaw* v. *Lindsey*, 15 Vesey, Jr., 380, and *Underhill* v. *Van Cortlandt*, 2 Johnson, 346, which, it is said, the Chancellor followed in excluding these depositions. In the former a witness appeared before the Commissioners with a

deposition ready prepared for answer to the interrogatories. On motion to suppress the deposition on this ground, Lord Eldon said: "Distinctly stating that I have no doubt that this examination contains the truth, still it appears to be an examination ready framed for the witness. . . . The proper order, considering what I believe to be his intention is, that the deposition shall be suppressed." But at the same time he ordered it to be retaken.

In the latter case Chancellor Kent, upon objection taken at the hearing to the deposition of Anderson on the cross-bill, remarked: "The order allowing depositions taken in the original cause to be read in evidence in the cross-cause, excepted that of Anderson, and he was consequently examined in the cross-cause; but how examined? By copying his deposition in the original cause. He went, therefore, before the examiner with a prepared deposition. This is against the course and policy of the court, and it would lead to most dangerous practices. . . . I should undoubtedly be justified in totally suppressing the deposition of Anderson on the cross-cause if I was to follow the strict rule of authority. If I have allowed it to stand in consideration of the regularity of the original deposition, I hope it is an indulgence that will never be abused."

This indulgence was doubtless granted in that case because, as disclosed in the opinion, the testimony of Anderson was contradicted by witnesses whom the Chancellor credited, and therefore did not affect his decision of the cause.

In the case at bar the Chancellor might very .well, in our view, have followed not only the reasoning of Chancellor Kent, but his example, and for the reason just given, as it would not have affected his decision of the cause, and would have freed it from embarrassment in case of appeal.

We may fairly presume, however, that respondents came to a hearing on the record as it then stood, relying upon the authority of the cases cited; and if Lord Eldon would suppress a deposition which he believed truthful because the witness had previously reduced his answers to writing himself, and if Chancellor Kent would have been "undoubtedly justified in totally suppressing" a deposition, merely because it was copied from one previously taken with due regularity in the same cause, it would seem to be within the discretion of the Chancellor in the case at bar to exclude one previously taken without cross-examination, which was attempted to be retaken by merely reswearing the witness to it, thus making it little else than an affidavit. On the other hand complainant doubtless supposed that as no exception had been taken to these second depositions before the hearing, none could be upon the hearing, and his depositions. could be read; and this brings us to the question whether, under our practice, the objection to these depositions was such as could be taken at the hearing.

In the case last cited, Chancellor Kent refused an application to suppress the deposition of Van Wyck, because not closed till after publication had passed, remarking: "It would seem too rigorous, when the·

other party has had the benefit of a cross-examination and has not raised the objection until the hearing, when no re-examination can be had and when no ill-use is stated to have been made of the irregularity."

To the same purport is our statute: " All exceptions to depositions for want of notice, because not filed in reasonable time, or for other causes going to the admissibility thereof, except objections to the competency of the witness or his evidence, shall be made and disposed of before the commencement of the hearing or trial; otherwise they will be considered as waived." Code, sec. 3868.

Under the practice thus prescribed, a majority of the court are of opinion, that these objections of respondents to said depositions, even if valid, came too late, and should have been overruled by the Chancellor; as, whatever might have been the practice formerly in England or New York, or even in Tennessee, with regard to the time of moving to suppress or exclude depositions, it is the evident intention of this statute to prevent the hardship of excluding, by snap judgment at the hearing, depositions duly taken upon notice, for some informality or irregularity in the manner of taking them, which does not affect their force or value as evidence in the cause, and thus depriving the party entirely of indispensable proof at a time when it is too late to supply the loss. Agreeing with the majority as to the purpose of the statute, Judge Turney and the writer do not concur with them in judgment as to the effect of its application in this case.

Objection to the competency of evidence may be

made on the hearing, and a party relying on incompetent evidence of any sort may thus find himself at the very argument of the cause without any proof whatever. It matters not that he has relied implicitly upon its value and truthfulness, or that its exclusion renders his cause hopeless, and deprives him of his rights therein. If he has leaned upon a broken staff and its pointed end has pierced his side, he must receive the wound and bear the suffering.

In this case we consider the objection as going to the competency of the evidence, and therefore allowable at the hearing.

By competent evidence is meant that which the very nature of the thing to be proved requires, as the fit and appropriate proof in the particular case. 1 Gr. Ev., sec. 2. In this case these witnesses had previously testified, and their proof was on file against Mabry. Was it competent, as against the other defendants, to prove that what they had sworn in the former deposition was true? Suppose the .case of a second trial at law of a joint indictment of several defendants, some of whom had on the former trial been convicted or acquitted; would it be competent evidence to prove by a State's witness on direct examination what he had sworn on the previous trial? Clearly not, even though the State's attorney should offer to follow this immediately with proof by the witness that those former statements were true. This seems analogous to the case at bar; and we are of opinion that the objection in this case was in time on the hearing

The Chancellor in this case, following the authority of distinguished judges, has in the exercise of his discretion, which we think he possesses with regard to depositions thus re-taken, excluded these depositions; and this discretion is not subjected to supervision in this court without reluctance, and only in cases where great hardship results. Still we think that in this case, even on the hearing, after excluding complainant's depositions, he should have suspended the hearing of the cause and allowed the evidence to be presented in proper form. And we cannot see why this was not asked on the hearing, or made the ground of a petition for re-hearing in the court below.

The opinion of the majority of the court, however, seems fully to justify the wisdom of the practice pursued.

4. But it is also objected by Mabry to the deposition of Moses, that it purports to give the contents of the minute book of the directors, when the original should have been produced.

The objection is well taken, but upon improper grounds. Corporation books belong to an excepted class of original writings, the production of which is not required. 1 Gr. Ev., sec. 484. But this does not allow parol proof of their contents. As in case of other books of the excepted class, their contents can be proved only by an immediate copy duly verified. *Ib.*

In part the deposition of Moses consists of copies from the minutes of proceedings of the directors' meetings; but in many instances, it seems to be only the oral testimony of the witness as t⸱ what does and what does not app⸱⸱⸱⸱⸱⸱⸱⸱⸱utes, and

this too in regard to vital parts of the case. This is clearly incompetent evidence. But in view of the majority of the court, since Mabry's objection was placed upon untenable ground, and the other respodents have made no objection to the deposition for this reason, this court cannot consider the objections now for the first time urged in their behalf.

Judge Turney and the writer are of opinion that the objection of Mabry is substantially to the admission of secondary evidence, and that, as the depositions had already been excluded as to the other respondents upon other grounds, there was no occasion or opportunity for them to object before the Chancellor upon this ground; valid objection to the same, therefore, for incompetency, since they are now for the first time admitted against them, might be made here, and that therefore they should be excluded.

The writer is further of opinion that, after excluding these depositions upon these technical grounds, and thus depriving complainant of his essential proof, which might result in the establishment of his equities, the cause should on proper terms be remanded to the Chancery Court to re-take proof in accordance with the practice recognized and established - in the cases of *Garner* v. *Hewet*, 2 Yer., 498; *Taylor* v. *Taylor*, 2 Hum., 597; *Cowan* v. *Mitchell*, 3 Col., 278, and *Grider* v. *Harbison*, 6 Col., 208.

But as the evidence is admitted, we must now consider and decide the case upon the record as it stands.

The particu' ᵢᵣₑₑ bill relied upon to hold defenda... .ᵤ.b. .ᵤad used $28,300

of the company's money, either in an attempt to procure other and further appropriations from the State, or had permitted the president to use the same for his own individual purposes.

This, respondents insist, is not proven. The evidence shows that defendants were president and directors as charged, and that a large amount of money, chiefly from the proceeds of sales of State bonds, came into their hands; that complainant's judgment was for work and labor done in the construction of the road; that on the 7th November, 1867, at a meeting of the board of directors, Mabry, the incoming president, was "authorized to take such steps as he may deem best to attain further aid from the Legislature toward the completion of the road, and that he be authorized to draw upon the treasurer for the funds needed for expenses." On the 18th November, Mabry accordingly received from the treasurer $3,000, and in December, $2,000.

On the 4th November, 1868, at a called meeting, the following preamble and resolutions were unanimously adopted:

"Owing to the unfinished condition of the Knoxville and Kentucky Railroad and the inability of the company to finish said road for the lack of funds; be it therefore

"Resolved, that the president of said road be instructed to associate with him such persons as he may select, and proceed to Nashville at the meeting of the Legislature on the 9th inst., and procure, if possible, an appropriation from the State sufficient to complete said road to the State line. And be it further

"Resolved, that he be allowed to use of the company's funds a sufficient amount to pay all necessary expenses in procuring said appropriation."

Under this resolution the president "associated with himself certain of the directors, defendants, and proceeded to procure, if possible, an appropriation," and to incur "all necessary expenses" therein.

What expenses were in his judgment necessary to compass the possibility of an appropriation, and in what way money was expended is not shown; but the little proof offered as to the acts of the president and his associates at Nashville, as well as the following resolutions and remarks of the directors, persuade us that they were not remiss in the performance of this commission, nor over-scrupulous as to the means employed. At a meeting of the board on the 27th March following, Dr. Pearne offered a preamble and resolutions, which, after reciting the action of the board, Nov. 7, 1867 and Nov. 4, 1868, continued thus:

"Whereas, in pursuance of the several actions of this board, the president has spent several months at Nashville with his associates, "applying to the Legislature for aid additional to the eight hundred bonds heretofore secured by him, and has thereby incurred considerable. expense during the last winter; therefore be it

"Resolved, that the president, Jos. A. Mabry, Esq., is hereby authorized to be credited by the treasurer for the amount he has expended under the foregoing resolutions; and further

"Resolved, that the board of directors * * * feel-

ing a due sense of obligation, do hereby tender their thanks to Gen. Mabry for the prompt and vigorous manner in which he has discharged the duties imposed upon him by the board; and further

"Resolved, that whatever responsibility follows his action in discharging the duties assigned him by the board attaches alike to each and every director, as the president was twice unanimously instructed at the former meetings instanced."

The passage of the resolutions was objected to by some of the directors, because the resolution did not define the amount or in what manner the expense had been incurred, or whether it had been legitimately incurred or not. It was not an itemized bill, and gave an opening for a great fraud upon the company. It was also suggested by a director, that the omission to state the amount was probably through inadvertence, and that the author would no doubt be willing to correct or change his resolution. To this Dr. Pearne replied that the amount had not been omitted through inadvertence, but that he had drawn the resolution after due deliberation and with the greatest care; that he had no change to make, and was determined that it should pass just as he had introduced it, without the crossing of a t or the dotting of an i. He also stated that it would be impolitic to have an itemized bill passed on account of action which might be taken by the Legislature; that lobbying expenses could not be paid in an itemized form without risk. Capt. Bearden, a director, stated that should the details of the expenditures be spread before the meeting, inas-

much as persons not of the board were present or within hearing distance, these· details would obtain a publicity which he deemed undesirable.

After much discussion the resolution passed by a vote of thirteen to nine, all the defendants in the affirmative.

The amount was not only omitted from the resolution, but was not perhaps openly stated in the meeting, nor was the account ever offered to the board or treasurer in an itemized form. Some of the defend-. ants knew the amount claimed, and intended to be granted in the resolution, and all might have learned at the time by inquiry.

President Mabry, in pursuance of the resolution, ordered the treasurer to credit him with $28,300, and it was done. This is the substance of the proof for complainant.

None of the defendants offer any proof on this subject, nor do any of them testify in their own behalf, save Pearne, who was one of the associates at Nashville. He protests that in his votes he acted in the utmost good faith to all; that he exerted himself at Nashville in trying to induce members to vote for an appropriation; that he never knew of money being paid to legislators to influence their votes; that he never· received any money for his efforts, save an indefinite hotel bill, which he reasons was only twenty dollars, because he does not think it could have been any more. He further says, on cross-examination:

"I know that Mr. Mabry went to Nashville several times in company with other directors; that he was there

a long time; that he rendered a general bill to the directors of money he alleged he expended in trying to procure aid for the company. I cannot tell * * * to whom he paid money, nor in what amounts, nor for what services. * * * I do not know. I did not know at the time. I did not then believe, nor do I now believe, that any part of the money alleged to have been expended was used to corrupt the Legislature or any member thereof. Had I so known or believed, I would not have voted to pay Mr. Mabry. No intimation of fraud or corruption was made when we voted to pay Mr. Mabry's bill. * * * * * I resisted the itemized bill sought for by some of the directors, because I thought it was intended by Mr. Sanford and others as a reflection upon Mr. Mabry's honor and honesty, which he had not deserved."

This comprises the material proof in the cause and, seems to establish the following state of facts:

Defendants, as the president and directors of the company, had under their control as trustees, with other monies, the sum of $28,300, the money of the company. This was a trust fund committed to them for the purpose of constructing and equipping the road. The trust fund has been used for some other purpose than the construction and equipment of the road, that is, the attempt to secure further legislative aid, or it has been appropriated by the president to his private use. The defendants, directors, all knew or might have known, how much the president claimed to have used as expenses in securing additional appropriation. They refused to call upon him for an itemized bill

of expenses because lobbying expenses could not safely be itemized, and because publicity would be undesirable. And so knowing, or having it in their power to know, that the sum of $28,300 was claimed by the president in bulk, for these lobbying expenses, they gave orders for it to be placed to his credit, thus ratifying this use of the fund, and indeed expressly assuming, each and every one, whatever responsibility follows his action.

It is true that these facts are not as clearly proven as they might be. But this bill calls upon defendants as trustees to account for trust funds in their hands. They refuse to answer, even denying the receipt of the funds and their own official character. Complainant proves these over their denial, and also that the funds were used for some other purposes than those of the trust. And yet they are silent, when they might speak, save Pearne, whose speech profits him nothing. And so, in the absence of all countervailing proof, we have no difficulty in declaring these facts established.

What consequence follows? Respondents insist in argument, upon their good faith, in defence, and plead the precedent of custom established by other corporations of using trust funds for lobbying purposes. There is no proof in the record of such custom, nor can we judicially know its existence. And if we did know it from proof or otherwise, we could not hesitate to declare such use of money granted by the State for its internal improvement a glaring misappropriation. The practice of lobbying is in its very na-

ture demoralizing and corrupting, and it seems a strange perversion of trust funds, to use the very money generously granted by the State for the laudable purpose of developing its resources, in unworthy efforts to influence her Legislature by those secret and insidious means, if not venal and corrupt appliances, which, to us, the term lobbying imports.

Good faith will not protect even trustees in bad acts. And if it be said that some of these defendants did not know how the money was used, we answer, it was their duty to know. They might easily have known. They should have called upon the president for a statement in detail of his expenditures. It was his duty to give it, and theirs to demand it, and their failure to do so is culpable negligence, which in law is the equivalent of fraud.

And so, whether these trustees acted in good faith or no, whether by negligence or fraud they sanctioned this application of trust funds, they must, as they resolved they would do, bear the responsibility. What that is, the law has made clear. Directors are not mere figure-heads of a corporation. They are trustees for the company, for the stockholders, for the creditors, and for the State. They must not only use good faith, but also care, attention and circumspection in the affairs of the corporation, and particularly in the safe keeping and disbursement of funds committed to their custody and control. They must see that these funds are appropriated as intended to the purposes of the trust, and if they misappropriate them or allow others to divert them from these purposes, they must answer

for it to their *cestui que trust.* In the last of the
remarkable Pearne resolutions, these directors builded
wiser than they knew. Though meant for bravado it
was really law. If they had never resolved to take
the responsibility, the law would have cast it upon
them. Counsel for respondents have relied upon cases
cited by them, in which it is declared that "directors
who act in good faith, and with reasonable care and
diligence, but nevertheless fall into a mistake, either
as to law or fact, are not liable for the consequences
of such mistake." We have neither ignored or dis-
regarded this principle. On the contrary, it is a cor-
rect expression of the doctrine of the law controlling
us in this case, for conversely they will be held lia-
ble for the consequence of their acts when they do
not act with reasonable care and diligence. No pru-
dent man would have done with his own money as
these directors have in this case. Even Dr. Pearne,
with his implicit trust in the president, would surely
not have allowed him to expend $28,000 or any like
sum of his individual property without giving him a
single item of the expense. Men do not thus deal
with their own, and trustees cannot thus deal with trust
funds. They must exercise reasonable care and dili-
gence, not less, certainly, than they would in their
own affairs, and they cannot, as in them, use the funds
at pleasure or according to their discretion in any
way, but must hold them sacred for the purposes of
the trust.

These wise and wholesome doctrines of the law in
regard to trusts are essential to their existence. They

inhere in their very nature, and are of universal application in all such cases.

Complainant, having a judgment against the company which he cannot satisfy at law, has a right in equity to subject its assets to the satisfaction thereof; and, if they have been diverted from trust purposes by the officers and trustees, he may hold them liable for the malversation. In this case we conclude that defendants have misappropriated of the company's funds more than enough to satisfy his judgment, and must therefore be held individually liable to him for the amount thereof, and decree will be entered accordingly with costs.

### ON PETITION TO REHEAR.

H. H. INGERSOLL, Sp. J., delivered the opinion of the court.

This petition of respondents seeks a rehearing upon several grounds, some of which were argued and considered on the hearing, the others are new.

Upon the former, the several members of the court consistently adhere to the various conflicting views expressed in the opinion already delivered, and in regard to them nothing need be added here. The new points are two:

First. That the complainant ought not to be allowed to appropriate the only known asset of a defunct corporation to the payment of his debt, to the exclusion of other creditors against whom respondents could not plead this judgment in bar of future recoveries sought upon the grounds of this bill.

Shea *v.* Mabry.

It does not appear that this is the only asset, nor that this is a defunct corporation, nor can we, as petitioners suggest, take judicial knowledge of its death. The condition of private corporations is not a subject of judicial notice, nor does the record show, or even suggest, the existence of other creditors. But if this were an insolvent corporation, and complainant had an attachment lien upon this asset, no reason is seen why, as in the case of *Marr* v. *Bank of West Tennessee,* 4 Col., 471, upon proper proceeding, the other creditors could not compel from him a *pro rata* distribution with them according to the principal and practice settled in *Rains* v. *Rainey,* 11 Hum., 261; nor can we see why the satisfaction of this judgment would not be a release *pro tanto* to respondents from liability for this misappropriation. But we need not decide upon the hypothetical case put under this objection to the decree. It is enough that the pleadings and proof do not raise the question.

Second. Complainant should not have his decree against respondents for his debt, because it is not known whether, after striking out this item of $28,300 credit in Mabry's account, he would be in debt to the company, and to ascertain this we are requested to remand for an account and proof.

This may be done if the record is such that a decree for an account would be proper on a hearing of the case before the Chancellor, if not, of course respondents cannot ask it here. The record stands thus: Complainant charges that the company is indebted to him, and that with the permission of other

respondents Mabry has misapplied the funds of the company. Mabry answers that the company "was at the time of the alleged judgment, and the filing of the bill, justly indebted to him, evidenced by State bonds and accounts, in a sum much larger than the sum alleged to have been misapplied, and hence in no event can he be held liable for said judgment." This is really a plea of set-off, but may possibly be regarded as equivalent to the plea of *nil debit* and payment. So treating it how stands the record?

Complainant has proven his allegations and is entitled to his decree unless something contrary appears.

We have here the plea of set-off, or pleas of *nil debit* and payment, with no proof to support either of them, and nothing in the record to suggest · that the company owes Mabry, but rather to the contrary. Upon this condition of the record could respondents before the Chancellor have a reference? It is well settled that in a proper case for account if an indebtedness appears *prima facie* in favor of a party, but the amount does not appear, a reference will be ordered to ascertain it, otherwise, however, if a *prima facie* case is not made out. Surely a mere denial or even an unsupported allegation will not authorize the reference.

As suggested by the petitioners, "it is to be regretted that the court has not the clearest possible light in which to act in deciding the case," but as the parties deem it best to give us no more, especially as respondents have not at all contributed to the small stock supplied, we must act with what they have been

Haynes *v.* Powell.

content to afford. Upon this point, however, we see nothing in the record to suggest even that an account would change the result, especially since Mabry, with all of complainant's proof standing against him, came to the hearing before the Chancellor without any proof whatever.

Applying the law, there is no escape from the conclusion that respondents would not, even if this were the first hearing before the Chancellor instead of the third in this court, be entitled to a reference, and we are constrained to refuse it and dismiss the petition.