In re Mark Hanna HAYS, III, Debtor.

John KOSIK & James Cubine, Plaintiffs,

v.

Mark Hanna HAYS, III, Defendant.

Bankruptcy No. 1–80–00798.
Adv. No. 1–80–0210.

United States Bankruptcy Court,
E.D. Tennessee.

June 17, 1983.

---

2. 11 U.S.C. § 1112(b)(2).

Terry Woods, and Hugh J. Moore, Jr., John Murrey, Witt, Gaither & Whitaker, Chattanooga, Tenn., for plaintiffs.

Scott N. Brown, Jr., Brown & Dobson, Chattanooga, Tenn., for defendant.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

John Kosik, James Cubine, and Thomas Cubine brought this action against the debtor, Mark Hays, to determine the dischargeability of debts he allegedly owed

them. The complaint was amended to object to the debtor's discharge generally. Thomas Cubine subsequently filed a bankruptcy case and failed to pursue this action. Another plaintiff, Neil Miller, was added but he also ceased participating in this proceeding. Only John Kosik and James Cubine remain as plaintiffs.

The plaintiffs were minority shareholders in Mark Advertising Communications, a corporation in which the debtor was the largest stockholder and the controlling officer.

The plaintiffs contend that the debtor should be denied a discharge under § 727(a)(3) of the Bankruptcy Code (11 U.S.C.). It provides:

> The court shall grant the debtor a discharge, unless ... the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case ....

At the trial on the discharge question, Roger Fitch, a certified public accountant, and the debtor, Mark Hays, III, testified.

Mr. Fitch testified as follows. He reviewed the debtor's bank statements from Pioneer Bank and First Tennessee Bank for January through June, 1979. He reviewed the bank statements for the debtor's wife's account from August, 1979 through May, 1980. He also reviewed the accounts of Marketing Services Group, a partnership in which the debtor was a member.

The debtor's account at First Tennessee and his wife's account showed payments of regular personal bills, such as electricity and telephone bills, and payments on some loans. The debtor stopped using his accounts in June, 1979.

From January through June, the debtor wrote checks for $10,700 in cash on the accounts at First Tennessee Bank and Pioneer Bank. He also wrote checks for $1,200 in cash on the account of Lookout Lake Farms, another of his business ventures. There were also checks written to Hays for Mark Advertising and Marketing Services Group that were not deposited in any of Hays' accounts. These checks totaled $3,480.

The debtor apparently received $7,462.02 in cash from his wife's account during August, 1979 through May, 1980.

Before June, 1979, deposits in Hays' various accounts totaled about $100,000. Checks totaling about $88,000 were written to named payees, and checks totaling about $12,000 were written to cash. After June, 1979, deposits to Hays' wife's account totaled about $40,000.

Mark Advertising ceased operating in June, 1979.

The debtor's testimony was as follows. He cashed $11,900 out of his personal account, transferred $5,300 to his wife's account, and deposited $2,050 directly to her account.

As to the $11,900, the debtor testified that $12,000 was not an abnormal amount of cash for him to spend in six months. He also testified that $1,500 was not an abnormal amount of cash for him to spend in one month. He traveled regularly on business. He has six children, three of whom live at home. He and his wife ate out about four nights a week.

The debtor closed his checking accounts in June, 1979 so that they would not be available for garnishment by his creditors.

The debtor did not recall his gross taxable income for 1979 but testified that he had a copy of his tax return.

The debtor testified that of the $7,462.02 he allegedly received in cash from his wife's account, he only received $1,255 in cash.

The debtor reiterated that some of the cash was spent on travel, even though he admitted also charging travel expenses on his credit cards. The debtor said he was probably spending $24,000 a year in cash.

The debtor also testified that he was the beneficiary of a trust that terminated on

his thirty-fifth birthday and that had assets, mostly stock, valued at $6,000.

In his answer to the complaint, the debtor averred that he withdrew from Marketing Services Group in June, 1979, and the records should be with the remaining partners. The debtor also averred that Tom Cubine was in charge of Mark Advertising's records and should still have voluminous records in his possession.

The debtor's bankruptcy case was begun by the filing of a voluntary petition on April 29, 1980.

## Discussion

The proof did not show to what extent the records of Mark Advertising and Marketing Services Group would be necessary to ascertain the debtor's personal financial condition. These records would be relevant to the debtor's business transactions. The proof did not show what attempts the plaintiffs had made to obtain these records or whether the debtor hindered them in their attempts. As to Marketing Services Group, the debtor probably had no choice but to leave the records with the remaining partners. There was no testimony as to whether the plaintiffs or the debtor attempted to obtain Mark Advertising's records from Tom Cubine. Until June, 1979, the debtor maintained a personal checking account or accounts that produced a fairly good record of his personal financial transactions up to that time.

 The plaintiffs had the burden of proving facts sufficient to deny the debtor a discharge. Bankruptcy Rule 407; In re Leichter, 197 F.2d 955 (3d Cir.1952) cert. den. 344 U.S. 914, 73 S.Ct. 336, 97 L.Ed. 705 (1953). The statutes are to be construed strictly against the objecting party. In re Leichter, cited above. The proof is not sufficient for the court to conclude that the debtor generally failed to make or keep adequate records up to June, 1979.

The proof at trial, however, focused first on the debtor's lack of records to explain how he spent $12,000 to $15,000 in cash

from January through June of 1979 and second on his lack of records thereafter.

The debtor spent a substantial sum of cash in six months, but he was engaged in three business ventures and had a large family. During the six months, he also had personal checking accounts. The records revealed that most of the money that passed through the accounts went to specific payees. The debtor testified that he spent some of the cash on travel expenses. The debtor admitted that he also charged travel expenses on credit cards, but there was no proof as to how much he charged. The court cannot assume that the debtor charged so much that he probably didn't spend much cash on travel expenses.

The evidence as to the debtor's spending and records after June, 1979 was not specific. It basically amounted to proof that after June, 1979, much less was deposited in the debtor's wife's checking account than had been deposited in his accounts in a comparable period. However, after June, 1979, Mark Advertising was no longer in business and the debtor was no longer a member of Marketing Services Group. His income may have been substantially reduced. The court does not know from the proof before it. Of course, the plaintiffs might argue that the debtor's lack of records make it impossible to know what income he had after June, 1979, but even this is not clear. Furthermore, the debtor was not asked how much income he had after June, 1979.

The question is one of degree. See Matter of Horton, 621 F.2d 968 (9th Cir.1980); Kaufman v. Hurwitz, 176 F.2d 210 (4th Cir.1949); In re Muss, 100 F.2d 395 (2d Cir.1938); In re Waldroop, 22 B.R. 284 (Bkrtcy.D.N.M.1982); Matter of Ramos, 8 B.R. 490 (Bkrtcy.W.D.Wis.1981); Matter of Goldberg, 2 B.R. 15 (Bkrtcy.S.D.Fla.1979).

The court believes that denial of a discharge should require more definite proof than the evidence before it and that the evidence does not show such a serious failure to make or keep records that the debtor should be denied a discharge.

The question remains whether the debtor owes the plaintiffs debts not dischargeable in bankruptcy.

The plaintiffs rely primarily on § 523(a)(4) of the Bankruptcy Code. 11 U.S.C. § 523. It provides that a discharge in bankruptcy does not discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny". According to the complaint, the plaintiffs were stockholders of Mark Advertising at a time when the debtor was controlling stockholder and president and, in violation of his fiduciary duty to them, he used corporate assets for his own benefit. The complaint further alleged that the debtor agreed to buy the plaintiffs' stock by paying a corporate debt secured by their property but the debtor failed to pay and the plaintiffs were forced to pay.

The court finds the facts as follows.

In October, 1977, the plaintiffs, the debtor, and Tom Cubine obtained from First Tennessee Bank what was apparently a $30,000 start-up loan for Mark Advertising. They signed a promissory note for $33,-224.40 dated October 20, 1977. This debt was secured by collateral pledged by the plaintiffs and Tom Cubine. P.'s Exhs. 2, 10, & 14.

On October 24, 1977, the plaintiffs were each issued a certificate for 15 shares of stock in Mark Advertising. The debtor was issued 165 shares and was president of the corporation. Tom Cubine was issued 105 shares of stock in Mark Advertising.

In April, 1978, the plaintiffs and Tom Cubine executed a guaranty agreement in which they promised to pay up to $50,000 of Mark Advertising's debts to First Tennessee Bank. Kosik testified that he signed the agreement in blank with the understanding that it would be for $30,000, and didn't learn that it was filled in for $50,000, until July, 1979, when the bank demanded payment.

James Cubine did not take any part in the management of Mark Advertising and in 1978 resigned as a director because he was leaving town to go to seminary.

Kosik resigned as a director in late December, 1978, because he was more interested in other business ventures and knew some people who were interested in becoming shareholders in Mark Advertising.

Kosik and James Cubine signed separate agreements to sell their stock to the debtor. The agreements are dated April 11, 1979. The transfer provisions of Kosik's and James Cubine's stock certificates were also dated April 11, 1979. James Cubine testified that he was living in Memphis and signed a copy and mailed it back, but only an unsigned copy was introduced into evidence. Kosik testified that Tom Cubine brought the agreement to him on the eleventh or twelfth or perhaps the fourteenth or fifteenth of April, 1979.

John Phillips, an attorney who was involved in these transactions, testified that he didn't know why the April date was used and that he received Kosik's and James Cubine's stock certificates in early May, 1979, but they were later returned.

In his answers to requests for admissions, the debtor denied that the agreements were entered into on April 11, 1979.

The pertinent part of the stock sale agreement was as follows:

1. *Sale of Stock.* Kosik agrees to sell to Hays 15 shares of MAC stock in consideration for Hays' agreement to make the installment payments on a loan made by the Bank to MAC so that certain collateral pledged by Kosik on such loan will be released by the Bank....

2. *Agreement with Bank.* Kosik has previously pledged collateral to the Bank with respect to a $30,000 loan made by the Bank to MAC in the form of cash value life insurance. Hays agrees to make the installment payments on this loan so that this collateral will be released by the Bank in accordance with the Bank's letter attached as Exhibit A....

The agreement with James Cubine was essentially the same.

Both Kosik and James Cubine testified that Exhibit A was not attached but was assumed to be a payment schedule.

Around the time the stock sale agreements were being circulated, the debtor obtained from First Tennessee Bank a $180,000 loan to Mark Advertising. The promissory note, dated April 16, 1979, was executed by the debtor as president of Mark Advertising and by Neil Miller as secretary. As collateral for the loan, Mark Advertising assigned money due to it under a contract with Radio and Appliance Distributors. The debtor also personally guaranteed repayment of the loan.

The $180,000 loan was disbursed as follows:

1. $59,267.67 to Radio and Appliance Distributors on a debt owed it by Mark Advertising;

2. About $58,000 to pay personal debts of the debtor;

3. $9,000 to Mark Hays, Jr.; and

4. The balance of about $53,000 to Mark Advertising.

The debtor in a letter to the bank stated that the personal debts were being paid with the corporation's loan to offset a $75,000 debt it owed him. The debtor stated that he had used the three loans that made up the $58,000 in debts for the benefit of Mark Advertising. Charles Myatt testified that the two loans from First Tennessee Bank, totaling $29,000, were for Lookout Lake Farms and the debtor's taxes. The third loan was made by Commerce Union Bank. The only proof that it was for Mark Advertising's benefit was the debtor's statement in his letter. This the court does not believe.

At the plaintiff's request, Roger Fitch, a certified public accountant, reviewed the available records of Mark Advertising. They did not show a debt to Mark Hays, Jr., the debtor's father and a principal in Radio and Appliance Distributors.

The records showed a debt of $31,600 to the debtor at the end of 1978. According to Mr. Fitch's calculations, this increased to $36,100 before the $180,000 loan. The debtor, however, received $16,000 of what the corporation received from the loan, thereby reducing the debt to $20,100. It increased again to $28,300 on June 29, 1979.

Despite the $180,000 loan, Mark Advertising soon went out of business. On July 5, 1979, Charles Myatt wrote letters to Tom and James Cubine and Kosik notifying them that the bank expected them to pay Mark Advertising's debts to the bank under their guaranty agreements. The letter stated that Mr. Myatt had learned that Mark Advertising had ceased operations on June 29. The letter listed the corporation's total debts, but did not assert that the plaintiffs were liable for all the debts. The plaintiffs were not asked to pay more than the amount of the guaranty and their personal liability on the start-up loan.

After the $180,000 loan was made, the corporation made payments on the other debts it owed to the bank. The $30,000 start-up loan was paid down from $9,690 to $6,921.75. The $22,500 loan was paid down from $22,500 to $7,247. Another $30,000 loan was paid down to $24,108.17. The total of the payments was about $23,913.

In return for payment of $9,703.81 each, the plaintiffs and Tom Cubine were released from any further liability to the bank under their guaranty. The release agreement identified five loan debts, totaling about $41,000, on which the Cubines and Kosik were liable. They did not include the $180,000 loan debt. Charles Myatt testified that James Cubine and Kosik made no payments on the $180,000 loan.

Both James Cubine and Kosik testified that they did not authorize the debtor to use corporate funds to pay his personal debts. Both also testified that Tom Cubine was still in Chattanooga, and they had recently spoken to him. James Cubine testified that he estimated his stock was worth $10,000 when he agreed to sell it to the debtor.

### Discussion

■ The plaintiffs contend that the debtor is indebted to them on several grounds. The plaintiffs cannot recover solely on the

ground that the debtor owes them a debt. The question is whether the debtor owes them a debt that is not dischargeable because it arose from the debtor's fraud or defalcation "while acting in a fiduciary capacity" as to the plaintiffs. "Fiduciary capacity" under § 523(a)(4) is not as broad a term as under state law. *In re Johnson,* 691 F.2d 249 (6th Cir.1982); *Matter of Angelle,* 610 F.2d 1335, 5 B.C.D. 1355 (5th Cir.1980).

The court thinks it is clear the debtor misappropriated part of the $180,000 lent to the corporation. He used about $58,000 to pay debts for loans that were not used for the corporation. The $58,000 total exceeded the corporation's debt to the debtor.

When he misappropriated the money, the debtor was acting in a fiduciary capacity as to the corporation and its stockholders. See *Harper v. Rankin,* 141 F. 626, 15 A.B.R. 608 (4th Cir.1905) cert. den. 200 U.S. 621, 26 S.Ct. 758, 50 L.Ed. 624 (1906); *In re Kelley,* 442 F.Supp. 525 (E.D.Va.1978); *In re Brown,* 4 B.R. 539 (Bkrtcy.N.D.Ill. 1980). Misappropriation should be considered "defalcation" within the meaning of § 523(a)(4). 3 Collier on Bankruptcy ¶ 523.-14[1][b] (15th ed. 1982).

The plaintiffs cannot recover a nondischargeable debt on the basis of the debtor's wrongs to the corporation. Shareholders can sue a director on behalf of the corporation to recover for injuries to the corporation, but any such recovery should be for the benefit of the corporation. The plaintiffs seek to recover for their own benefit and not for the corporation's benefit.

Having paid the bank, the plaintiffs might be subrogated to the bank's rights as a creditor. A creditor can recover directly from a corporate officer who misappropriates the corporation's funds, rather than paying the creditor. *Shea v. Mabry,* 69 Tenn. 319 (1878); *Shea v. Knoxville & Ky. R.R.,* 65 Tenn. 277 (1873); see generally Fletcher, Cyclopedia of the Law of Private Corporations § 1185 (rev. perm. ed. 1975). Nevertheless, there is usually no fiduciary relation of the kind required by § 523(a)(4) between the creditor and the corporate officer. *Matter of Cross,* 666 F.2d 873 (5th Cir.1982); *Kelley v. Conwed Corp.,* 429 F.Supp. 969 (E.D.Va.1977); *In re Baiata,* 12 B.R. 813 (Bkrtcy.E.D.N.Y.1981).

There may be such a fiduciary duty in some situations, but the proof failed to show a special fiduciary relation between the bank as a creditor of the corporation and the debtor as the operating officer. *John P. Maguire & Co. v. Herzog,* 421 F.2d 419 (5th Cir.1970), distinguished *Matter of Cross,* 666 F.2d 873 (5th Cir.1982); *In re Fussell,* 15 B.R. 1016 (D.U.S.D.C.W.D.Va. 1981); *Matter of Folliard,* 10 B.R. 875 (D.U.S.D.C.D.Md.1981); *In re Gottheiner,* 3 B.R. 404 (Bkrtcy.N.D.Cal.1980).

Finally, even if the plaintiffs are subrogated to the bank's rights, the debtor's fiduciary duties to the plaintiffs as stockholders would not make the debt nondischargeable.

The debtor may be personally indebted to the plaintiffs for breach of the stock sale agreements. Certainly the debtor wronged the plaintiffs as stockholders by using the corporation's money first for his benefit, rather than paying the corporation's debts that he had agreed to pay in return for stock, but this was not a breach of a special fiduciary duty owed to the plaintiffs with regard to paying the debts.

The plaintiffs also failed to prove that the stock sale agreements were a fraud intended to remove their rights as stockholders to object to the $180,000 loan or its use.

The court does not doubt that the debtor was a wrongdoer. He obtained a large loan for the corporation and used it to pay personal debts ahead of the debts he had agreed to pay under the stock sale agreements. But this wrong did not create a debt not dischargeable under § 523(a)(4).

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 752.