Henry's Drive-In, Inc., Plaintiff-Appellee, v. Thomas A. Anderson, Defendant-Appellant.

**Gen. No. 48,433.**

First District, Third Division.

June 6, 1962.

Rehearing denied September 27, 1962.

Kirkland, Ellis, Hodson, Chaffetz & Masters, all of Chicago (Vernon M. Welsh and Frank L. Winter, of counsel), for appellant.

Charles C. Kirshbaum, of Chicago (Harry G. Fins, of counsel), for appellee.

MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

In this case the defendant is taking an appeal from two decrees entered in the Circuit Court of Cook County. The plaintiff, Henry's Drive-In, Inc., filed a suit primarily seeking an injunction to restrain the defendant, Thomas A. Anderson, a former employee of plaintiff, from competing with plaintiff over the entire United States except the "Chicago Metropolitan Area" for a period of five years from April 8, 1958. The complaint also prayed that the plaintiff might have such other and further relief as may be equitable in

the premises. The plaintiff sought the injunction on the basis of a restrictive covenant in the defendant's employment contract. The matter was referred to a master in chancery, and the chancellor in his decree entered June 25, 1959 followed the recommendations contained in the master's report and held the covenant too broad under the circumstances of the case and therefore unenforceable. As a part of the findings of fact in that decree the chancellor found, in accordance with the master's recommendations, that when defendant left plaintiff to form his own corporation, The Golden Hamburger Drive-In Corporation, he took with him three of plaintiff's prospects for operators of plaintiff's drive-in restaurants, Nicksic, Busse and Carrerras, and made them operators for Golden Hamburger. These three had made money deposits and executed deposit agreements for franchises with the plaintiff. In the June 25, 1959 decree the chancellor, in accordance with the master's recommendations, re-referred the cause to the master to take an accounting under his direction to determine the loss and damage sustained by plaintiff by reason of the sale of franchises by defendant to the three mentioned persons. On the re-reference the master held a hearing and found that the plaintiff had suffered damages in the sum of $52,456.69. The defendant had filed a counterclaim alleging that he was owed compensation by the plaintiff for his work prior to April 8, 1958. The master found that the plaintiff owed the defendant $1,864.05, which finding was approved by the chancellor in his decree. This amount was set off against the amount found due the plaintiff as damages, and a monetary decree was entered January 6, 1961 entering judgment against the defendant in the amount of $52,130.03 including certain costs. The defendant appeals from certain portions of these decrees, to wit, from the portion of the decree of June 25, 1959 which re-refers

117

the cause to the master in chancery with directions to take an accounting to determine the loss and damage sustained by plaintiff by reason of the sale of franchises by defendant to persons who had made deposits and executed deposit agreements for franchises with plaintiff while the defendant was in the employ of plaintiff, and from the portion of the decree which denied defendant's motion at the close of plaintiff's case to dismiss the cause for want of equity. He also appeals from the portion of the decree of January 6, 1961 overruling defendant's exceptions to the master's report and approving the master's report, and from the portion of the decree which entered a judgment in favor of plaintiff and against defendant in the sum of $50,592.64 and in addition a judgment in the amount of $1,537.39 as the cost of the accounting from the defendant, making in all the sum of $52,130.03. The defendant prays that this court reverse the above portions of the decrees and remand the cause with directions to enter a judgment in favor of the defendant-counterclaimant in the amount of $1,864.05, together with all the costs of the injunction proceedings and the accounting proceedings heretofore paid by the said defendant-counterclaimant, being the sum of $4,373.93.

We will first consider the appeal from the portions of the decree of June 25, 1959.

It appears from the record that in 1955 plaintiff was organized to engage in the self-service drive-in restaurant business. Its method of operation was, after deciding on a location, to locate an operator and negotiate with the owner of the premises to build a restaurant according to plaintiff's specifications. The owner would then lease the premises to plaintiff which in turn would sublease it back to the operator. Plaintiff derived income from these operators from the following sources: (1) initial franchise fee of $1,500; (2)

profit on the sale of equipment; (3) an annual franchise fee of 1½% of the yearly gross sales; (4) $100 per month rental override, which was the difference paid by plaintiff and the amount paid by the sublessee to plaintiff; (5) a management fee of 5% of the gross purchases made by the operators from approved food purveyors.

On May 11, 1956 the defendant joined plaintiff's organization and entered into a contract of employment with it. Under that contract defendant's responsibilities were to supervise plaintiff's operations outside the Chicago metropolitan area. The contract further provided that when defendant should obtain a prospect who is desirous of becoming a franchiser he shall submit to the plaintiff a deposit agreement, together with a good faith deposit, and if the prospect is acceptable to the plaintiff the plaintiff shall execute and issue its standard form franchise agreement for a Henry's Drive-In to said prospect, and it provided that defendant should be compensated on a commission basis. The contract also contained a restrictive covenant which provided that on the termination of the agreement defendant should not, for a period of five years thereafter, directly or indirectly engage in the business of setting up franchisers or franchises for the operation of drive-in type restaurants in the territory provided for therein either for his own benefit or for or with any person, firm, or corporation whatsoever except plaintiff.

Subsequently on or about November 20, 1956 Bresler, the principal stockholder of the plaintiff, orally agreed with the defendant that the defendant was to take on the servicing of the Chicago metropolitan area in addition to his other duties, and that the plaintiff would pay him $600 per month plus 17½% of the net profit made on the sale of equipment to the operators in the Chicago area. Later the $600 per month was

119

raised to $900 per month. With respect to the national market the plaintiff and defendant were to divide all profits on a 50-50 basis and the defendant was to pay all expenses related to sales. The plaintiff was to pay all operational expenses, such as office rent, office personnel, telephone, telegraph and supplies. Early in 1958 serious disagreements and disputes arose between plaintiff and defendant. In March or the early part of April defendant decided to leave plaintiff's organization. He admitted that he had discussed the formation of his own company with a number of plaintiff's employees while he was still employed by plaintiff. Defendant had been elected president of the plaintiff corporation on October 1, 1957. In March of 1958 defendant retained an architect to draw some building plans for his prospective drive-in business, and on April 5, 1958 he retained another architect to draw additional plans. He submitted his resignation on April 8, 1958, but told Bresler that he would stay for an additional thirty days to train anyone that Bresler had in mind. Bresler said that that was not necessary and defendant said he would like to leave as soon as he possibly could. There was subsequently some further conversation with reference to defendant's leaving and about the restrictive covenant in defendant's contract of employment, as well as about money allegedly owed defendant. Heller, the bookkeeper for plaintiff, left the corporation with defendant on April 9, 1958.

Two days prior to the time when defendant left plaintiff he had talked with one Kotlisky, plaintiff's Florida franchiser, and in that conversation defendant attempted to persuade Kotlisky to leave plaintiff and join his organization. Kotlisky told him that he could not afford to make such a move. Defendant made another proposition to him with reference to the money to be paid for a franchise but Kotlisky finally refused to leave plaintiff.

Defendant admitted soliciting Carrerras to accept a franchise with his organization, and at the time that defendant was negotiating with him he knew Carrerras had a good faith monetary deposit with plaintiff. Defendant, the day that he resigned as president of plaintiff, directed plaintiff's bookkeeper to return the $1,500 good faith deposit to Nicksic and Busse. The deposit of Carrerras was returned to him sometime after April 8th. Carrerras, Nicksic and Busse subsequently took out franchises with Golden Hamburger.

Defendant states that the decree of June 25th should not have been entered because there is no showing that Carrerras, Nicksic and Busse would have become franchisers for plaintiff if there had been no intervention by defendant.

The good faith agreement which was executed with plaintiff by the three required a deposit from each, but it further provided that plaintiff could reject the applicant and the applicant could, if he did not approve of the franchise agreement and lease tendered to him by plaintiff, refuse it and thereupon his deposit would be returned to him. Defendant had been negotiating with the three prospects concerning a franchise from plaintiff for six or seven months, though at the same time there was some negotiation between the three and other owners operating drive-in restaurants.

There is no question that the deposit agreement was not a binding contract. However, it is unreasonable to take the view that the negotiation between the three and plaintiff was a merely casual relationship, and such a view would disregard the reality of the situation. The master in his report on which the decree of June 25th was based found that the plaintiff was entitled to an accounting to all sums received by the defendant from the sale of franchises, "including profits on the sale of equipment and all other income" received from such persons who had made deposits

with plaintiff while the defendant was in the employ of the plaintiff, and the master recommended that an accounting be taken under the direction of the court to determine the amount of loss and damage sustained by the plaintiff. The court in its decree ordered that an accounting be taken to determine "the loss and damage sustained by plaintiff by reason of sale of franchises by defendant to persons who had made deposits and executed deposit agreements or franchises with plaintiff while defendant was in the employ of plaintiff."

The defendant here argues the decree was not clear as to whether there was to be an accounting to determine the money received by defendant from the three franchisers or whether the master was to determine the loss and damage which was sustained by the plaintiff by reason of the allegedly wrongful enticing of the three franchisers away from plaintiff and into his company at the time when he owed a fiduciary duty to plaintiff. From the decree of the court and the proceedings in the subsequent hearing before the master it is apparent that what was really sought was a determination of the loss and damage sustained by the plaintiff.

The law is uncontroverted that corporate officers and directors owe a duty to the corporation to take no advantage of their position for their financial gain in derogation of the corporation's rights. An officer or director of a corporation, though not responsible for errors of judgment, is a fiduciary charged with the duty of caring for the property of the corporation and managing its affairs honestly and in good faith. If this duty has been so violated as to result in an impairment of its assets or loss of its property he can be compelled to make restitution. 3 Fletcher, Cyclopedia Corporations, sec 1011, p 514 (Perm Ed). In

Guth v. Loft, Inc., 23 Del Ch 255, 5 A2d 503, the court says:

> ". . . it is equally true that, if there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if, in such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired. . . . [Citing cases.]"

The court further held that it was incumbent upon an officer of the corporation to show that his every act in dealing with the opportunity presented was in the exercise of utmost good faith. The test as to whether an officer of a corporation has breached his fiduciary duty to the corporation is "whether there was a specific duty, on the part of the officer sought to be held liable, to act or contract in regard to the particular matter as the representative of the corporation—all of which is largely a question of fact." 3 Fletcher, Cyclopedia Corporations, sec 862. See Shlensky v. South Parkway Bldg. Corp., 19 Ill2d 268, 166 NE2d 793; Dixmoor Golf Club, Inc. v. Evans, 325 Ill 612, 156 NE 785. The same rule has been laid down with reference to the reciprocal duties between joint adventurers. Hagerman

v. Schulte, 349 Ill 11, 181 NE 677; Ditis v. Ahlvin Const. Co., 408 Ill 416, 97 NE2d 244.

██ There is ample evidence in the record to support the master's finding that defendant breached his fiduciary duty to the corporation and that the corporation was entitled to recover as damages the loss of profits which had been suffered by it as a result of defendant's dereliction. The decree of June 25, 1959 so holding and referring the cause to a master to take evidence and determine the damages was properly entered.

The defendant also urges that the portion of the decree of January 6, 1961 entering a judgment against the defendant in the sum of $50,592.64, and in addition a judgment in the amount of $1,537.39, making a total of $52,130.03, should be reversed. On that phase of the case the defendant argues that the decree was improper inasmuch as the master's calculations of loss to the plaintiff were erroneous. The defendant contends that the master's calculations of profits of which the plaintiff was deprived are not net profits and that the portion of the award which is based on projected future profits it not supported adequately by evidence.

The master computed the plaintiff's loss of net profits from the restaurants operated by Busse, Nicksic and Carrerras in the following manner. The first item allowed by the master was a debit of $1,500 from both Carrerras and Busse for the initial franchise fee. As to operator Nicksic the master allowed only $375 because Nicksic was located outside the Chicago metropolitan area and the plaintiff would have had to deduct the commissions which were due to the state franchiser and the defendant.

The second item of income of which the plaintiff was deprived was the profit on the sale of equipment to these operators. The figures used by the master for Carrerras and Busse were based upon the average

profits that the plaintiff had received from the sale of equipment to four other established Henry's Drive-Ins in the Chicago area. He reduced this amount by deducting $17\frac{1}{2}\%$ which would have been the defendant's commission had he remained in the plaintiff's employ. The same base figure was used for Nicksic; however, there were offsetting credits for the state franchiser and also the defendant.

The third item was the plaintiff's loss of profit from the rent override. The master allowed the plaintiff $100.00 per month for Carrerras and Busse but made no allowance for Nicksic who owned his own property and therefore would not have had to pay any rent override to the plaintiff.

The fourth item was a management fee, which was a rebate received from food purveyors on the total sales of food to plaintiff's operators. Plaintiff received $5\%$ of these gross sales as a rebate. The master limited the plaintiff's recovery for this item to $2\frac{1}{2}\%$ of the actual dollar purchases of the three operators in question.

The fifth item was the annual franchise fee of $1\frac{1}{2}\%$ of the yearly gross sales, which was computed on the actual sales of these three operators. There is testimony in the record that the estimated sales of an operator would be approximately $200,000 per year. This evidence is undisputed and in fact was recognized by the defendant as an accurate estimate.

The general rule undoubtedly is that in a case such as this the damages recoverable by the plaintiff are the plaintiff's loss of profits and not what the defendant's profits or losses were. Walter Baker & Co. v. Slack, 130 F 514. The profits would necessarily be the net profit which would have accrued to the plaintiff. In support of this point the defendant cites Pluard v. Gerrity, 162 Ill App 527; Voss v. Becko, 192 F2d 528 (8th Cir); and National School Studios v. Superior School Photo Service, 40 Wash 263, 242 P2d

756. While the factual situation in these cases differs from that in the instant case, there can seem to be no reasonable argument made against the logic of such a claim.

In the instant case the computed profits are not net profits. A net profit is the difference between the gross receipts and the costs of running the business. In the computation it is apparent that certain costs were deducted. Under the agreement the plaintiff was required to pay all operational expenses, such as office rent, office personnel, telephone, telegraph and supplies, and from the record it also appears that the plaintiff furnished a great many services to its operators: policy making, market and other research, scientific testing, advertising, promotion and supervision. None of these costs were apportioned and charged against the three operators. Nor are any of these costs deducted from the gross income. In order to arrive at a net profit such deduction would be necessary. In Eastman Co. v. Southern Photo Co., 273 US 359, the plaintiff was seeking loss of profits from the defendant as a result of the latter's monopolistic activities. In that case the court said the damages could be calculated by taking estimated expenses from the gross profits so as to establish a loss of net profits, and that if a reasonable basis for computation is used it shall be sufficient to establish damages even though the result is only approximate. The court said on page 379: "Furthermore, a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible." See Sutherland, Damages, vol 2, sec 658 (4th Ed). In Raymond v. Yarrington, 96 Tex 443, 73 SW 800, the court aptly stated the judicial philosophy applicable to cases of breach of covenant not to com-

126

pete, saying on page 804: "From the nature of the case it is impossible to show the damages with accuracy, and to require accuracy in such a case would be to deny a remedy for a wrong." Also see Lashus v. Chamberlain, 6 Utah 385, 24 P 188. In spite of the liberal rule with reference to the proof of damages on the part of a wrongdoer, nevertheless it is necessary to prove net profits in order to properly estimate the loss suffered.

██ ██ The defendant also argues that there should be no recovery for future profits. The master projected the figures which he considered the loss to plaintiff over a five-year period, and in his conclusions he states that he used the five-year period as the basis because plaintiff had been in business for five years. The plaintiff had asked for a projection for a period of twenty years. The defendant admits that future profits could be allowed, but he insists that there was not sufficient proof for the master's projection. In any projection such as this there can be no absolute certainty. The only rule which has been laid down is that the future profits should be estimated with reasonable certainty. The experience of the past shows that plaintiff had operated successfully for a period of five years. There is nothing in the record which would indicate that the operation would not be equally stable and successful for an additional five years. The defendant could have introduced evidence to throw light upon this proposition if he had seen fit. No such evidence was offered. The master undoubtedly also considered the fact that the restrictive covenant in the original contract was for a period of five years. Under the rule laid down in Industrial Nat. Gas Co. v. Sunflower Nat. Gas Co., 330 Ill App 343, 71 NE2d 199, and Story Parchment Co. v. Paterson Co., 282 US 555, the projection of the profits for five years is not unreasonable.

The defendant also objects that there was no showing that the operations of Busse and Carrerras, because of their locations, which were not the same locations in which plaintiff was going to place them, would have been different, and the defendant states in his brief that the master should have permitted the defendant to make such a showing. We have been unable to find anything in the abstract to indicate that the defendant made any attempt to introduce such evidence.

██ ██ Had the master computed the net profits of the three operators with a projection for five years there would have been no error in the record. Where a material question is in controversy upon a material issue and the record discloses that all the evidence on that issue has not been produced, this court has the power to reverse the judgment and remand the cause for the taking of further evidence, on the part of either or both of the parties, upon the issues. American Smelting Co. v. Industrial Com., 353 Ill 324, 187 NE 495. See also Hood v. Brinson, 30 Ill App2d 498, 175 NE2d 300; Wong v. Hazard, 26 Ill App2d 23, 167 NE2d 565; and Paul Harris Furniture Co. v. Morse, 10 Ill2d 28, 139 NE2d 275. In this case the judgment must be reversed and the cause remanded to the trial court in order that loss of net profits may be proved.

██ The defendant also objects to that portion of the decree of June 25, 1959 which ordered each party to pay its own costs and one-half of the master's fees and charges. The court in that decree denied relief to the plaintiff on the restrictive covenant. It properly found that the cause should be re-referred to a master to take an accounting to determine the loss and damage suffered by the plaintiff by reason of the sale of franchises by the defendant to persons who had made deposits and executed deposit agreements for franchises with plaintiff while the defendant was in the

employ of plaintiff, and to take an accounting as to the amount of compensation due and unpaid to the defendant on April 9, 1958. Under those circumstances it does not appear that the ruling of the court with reference to costs and the master's fees was inequitable.

■ At the hearing before the master the plaintiff offered in evidence certain documents of the defendant, among them complete blueprint plans of "The Golden Point" drive-in restaurant. These were submitted in order to show similarities between The Golden Point equipment layout and the layout in plaintiff's "Little Bill" operation. Bresler was asked by counsel for the defendant how he obtained the plans and he stated that he was unwilling to state from whom he received the documents. Defendant argues that because of that refusal the plaintiff was in a court of equity with unclean hands and is not entitled to equitable relief. The court took the view that the plaintiff was not estopped from claiming damages because the defendant did not move the master to certify the question to the court, nor did he pursue Bresler's refusal to answer the question in any fashion whatsoever. We agree with the conclusion of the court. If we assume that Bresler obtained the plans improperly, the wrong done the defendant by their admission in evidence was very slight and a review of the authorities does not bring to light any case which would justify the imposition of such a drastic remedy. See City of Chicago v. Union Stock Yards and Transit Co. of Chicago, 164 Ill 224, 45 NE 430.

■■ In the decree of January 6, 1961 the court ordered that the plaintiff should recover from the defendant the sum of $1,537.39 as the cost of the accounting. This order was a proper order. Since we are reversing and remanding the case with directions to the trial court to determine what the allegedly lost net profits would be, and since the failure to prove that

129

essential of the case must be laid to the plaintiff, the costs of the re-reference should be borne by it.

The decree entered in the Circuit Court of Cook County on June 25, 1959 is affirmed. The decree entered on January 6, 1961 is reversed, and the cause is remanded with directions to the trial court to determine the loss of net profits which would result to plaintiff by the wrongful conduct of the defendant in depriving plaintiff of the three operators in question, and for further proceedings consistent with this opinion.

Affirmed in part, reversed in part and remanded with directions.

DEMPSEY and SCHWARTZ, JJ., concur.