**In re J. James BROWN, Bankrupt.**

**ALCO COMMUNICATIONS, INC., Plaintiff,**

v.

**J. James BROWN, Defendant.**

**Bankruptcy No. 79 B 3703.**

United States Bankruptcy Court,
N. D. Illinois, E. D.

June 3, 1980.

**540**

Howard D. Hollander and Richard J. Hollander, Chicago, Ill., for plaintiff.

Kevin O'Donnell, of Pratt, Calabrese & O'Donnell, Ltd., Palatine, Ill., for defendant.

## ORDER

LAWRENCE FISHER, Bankruptcy Judge.

This matter coming on to be heard upon the Amended Complaint of Alco Communications, Inc., creditor of the above-named Bankrupt pursuant to Section 17c(2) of the Bankruptcy Act to determine the dischargeability of debt claimed to be nondischargeable pursuant to Clause Four of Section 17a of the Bankruptcy Act, and the Answer of Bankrupt thereto, and the parties appearing by their respective attorneys, and

The Court having examined the pleadings filed in this matter and having received and examined all evidence adduced and having heard the testimony of witnesses and arguments of counsel, and having received and examined Memoranda of the parties in support of their respective positions, and the Court being fully advised in the premises;

The Court Finds:

1. Alco Communications, Inc. is an Illinois corporation which engineers, furnishes and installs, and provides financing for the installation of telephones and telephonic communication equipment. J. James Brown was a director of the corporation and was hired as its President pursuant to an Employment Agreement dated October 14, 1977. The Agreement provided in pertinent part as follows:

"  .   .   .

1. EMPLOYMENT—The Company hereby employs Employee as its President. Employee shall be the chief executive officer of the Company and shall have the authority, duties and responsibility of such an officer.

.        .        .        .        .

2. BEST EFFORTS—Employee will devote his entire working time to the business and affairs of the Company. He will exert his best efforts, and all of his skill and experience, to the

promotion and development of the best interests of the Company, and will serve the Company loyally and faithfully. He will engage in no other business activities or affairs whatever, neither for another party nor in his own behalf, and without regard to whether such non-Company services are performed after established working hours or on week-ends. It is intended by the Company and by Employee that no business matters other than the affairs of the Company itself shall occupy any of Employee's time or divert any of Employee's activities. Employee, however, has the right to invest his assets as he chooses (other than in those of a Company competitor), but Employee may perform no services for the companies in which he has invested. Commissions, fees, or any other business income paid to or earned by Employee shall be remitted to Company. . . . "

A copy of the Employment Agreement was offered and received into evidence as Plaintiff's Exhibit No. 20.

Robert Keno served as Vice President of Alco Communications, Inc. and was also a director. Both Robert Keno and J. James Brown were involved in the formation of Alco Communications, Inc.

2. Wilton Corporation was a leasing customer of one of Plaintiff's affiliated companies. Alco Communications, Inc. conducted a mail and telephone solicitation of several thousand of such leasing company customers concerning the acquisition of a telephone system. Wilton Corporation responded and the lead was given to Bankrupt, J. James Brown for contact and sales promotion.

On September 12, 1978, Bankrupt sent a letter to Mr. Kenneth L. Swick, Director of Procurement at Wilton Corporation, on behalf of Alco Communications, Inc. which letter contained Bankrupt's recommendations for a new telephone system for Wilton. A copy of the letter was offered and received into evidence as Plaintiff's Exhibit No. 1.

On October 11, 1978, Bankrupt sent to Mr. Swick a proposal for the new telephone system. The proposal was sent on Alco Communications, Inc. stationery and was signed by J. James Brown as President. The proposal provided for engineering, installation, and financing of the new system. A copy of the proposal was offered and received into evidence as Plaintiff's Exhibit No. 2.

A Pricing Worksheet for the proposed Wilton job, dated September 11, 1978 prepared by Bankrupt, was offered and received into evidence as Plaintiff's Exhibit No. 26. The worksheet provides in pertinent part as follows:

" . . .

| | | |
|---|---|---|
| Equipment – List Price | 37,273.00 | |
| Discount (__%) | ——— | 37,273.00 |
| Tax | | 1,863.65 |
| Freight-In | | 745.00 |
| Installation & Engineering | | 12,760.00 |
| Wire & Cable | | ——— |
| First-year Service (12 x $250.00) | | 3,000.00 |
| | JOB COST | 55,641.65 |
| | GROSSMARK (1.5%) | 27,820.82 |
| | BASE | 83,462.47 |

. . . "

Bankrupt and Robert Keno both testified that the "grossmark" of $27,820.82 was the gross profit expected to be earned on the sale of the telephone system to Wilton.

3. On October 30, 1978, William P. Schmiederer, Vice President of Finance at Wilton Corporation, wrote a letter to the First National Bank of Blue Island introducing J. James Brown, President of Alco Communications, Inc., as authorized to represent Wilton Corporation in its telephone equipment purchases and financing. A copy of the letter was offered and received into evidence as Plaintiff's Exhibit No. 4. Bankrupt brought this letter to a meeting held several days after October 30, 1978 between himself, Mr. Schmiederer, Mr. Swick, and a representative of the First National Bank of Blue Island. The bank had financed the installation of Wilton Corporation's original telephone system, and discussion at the meeting concerned the amount that would be required to pay off the balance on the loan as well as the terms of financing a new installation.

4. Shortly after the aforesaid meeting, Wilton Corporation turned down Plaintiff's proposal. The rejection was communicated verbally to J. James Brown some time during the first week of November, 1978. Kenneth Swick testified that the rejection was based upon Plaintiff's reluctance to give Wilton Corporation the kind of leasing terms they wanted and that Wilton Corporation would have contracted with Alco if different leasing arrangements could have been made. He further testified that Brown did not offer to try to arrange better financing terms with Plaintiff and that Brown gave Wilton Corporation the impression that Plaintiff would not restructure the agreement.

Robert Keno testified that Bankrupt never discussed with him the possibility of more favorable leasing arrangements for Wilton Corporation. Mr. Keno stated that Alco Communications, Inc. would have been glad to arrange different financing terms for the Wilton job if it had been given the opportunity to do so.

5. Within a day or two after Wilton Corporation's rejection of Plaintiff's proposal, J. James Brown began negotiating on his own behalf to engineer, furnish, and install a new telephone system for Wilton. On November 8, 1978, he submitted to Wilton Corporation a study of its existing telephone system and of a proposed installation. A copy of the study, which was typed on "J.J. Brown Engineering Co." letterhead, was offered and received into evidence as Plaintiff's Exhibit No. 6.

6. Thereafter, on November 10, 1978, Robert Keno sent a memo to Bankrupt asking for the current status on each of several prospects, one of which was Wilton Corporation. Bankrupt responded to the inquiry on November 11, 1978, and with regard to the Wilton Corporation job, he wrote, "Waiting for go ahead." A copy of the memo and Bankrupt's response were offered and received into evidence as Plaintiff's Exhibit No. 27.

On November 13, 1978, Robert Keno again sent a memo to Bankrupt inquiring specifically as to the status of the Wilton Corporation job. Bankrupt did not write a response to this inquiry. A copy of the November 13, 1978 memo was offered and received into evidence as Plaintiff's Exhibit No. 28.

7. Bankrupt submitted a proposal to Wilton Corporation on November 15, 1978, a copy of which was offered and received into evidence as Plaintiff's Exhibit No. 7. The proposal outlined the equipment engineering services which Bankrupt was offering Wilton Corporation and included a payment schedule as follows:

". . .

| | |
|---|---|
| Total Engineering & Labor | $22,600.00 |
| Payment Schedule | |
| ⅓ on signing authorization | $7,533.33 |
| ⅓ on Equipment Delivery | 7,533.33 |
| ⅓ on Completion | 7,533.33 |

. . ."

Wilton Corporation made and delivered to J. J. Brown its check in the amount of $7,533.33 in accordance with an invoice of J. J. Brown for that amount. The invoice provided as follows:

"Engineering per authorization letter of 11/15/78 $7,533.33"

Copies of the check and invoice were offered and received into evidence as Plaintiff's Exhibit No. 30.

8. On November 17, 1978, two days after he received his first check from Wilton Corporation, Brown for the first time indicated to Robert Keno that he had dealt with Wilton Corporation on his own behalf and that he intended to contract for the engineering and installation of a telephone system. Bankrupt was fired immediately, and subsequently Mr. Keno wrote Bankrupt a letter dated November 17, 1978 confirming the termination of his employment with Alco Communications, Inc. and demanding the return of all papers, files, books, forms, customer lists, and other documents related to Plaintiff's business. A copy of this letter was offered and received into evidence as Plaintiff's Exhibit No. 29.

9. Thereafter, on November 22, 1978, Bankrupt submitted on his own behalf an additional proposal to Wilton Corporation, which was signed as accepted and approved by a representative of Wilton. A copy of

the proposal was offered and received into evidence as Plaintiff's Exhibit No. 8. J. James Brown testified that the November 22 proposal related to the November 15 agreement and that he was to be paid in accordance with the latter.

Pursuant to the payment schedule set forth in the November 15 proposal, Wilton Corporation made and delivered additional checks to J. J. Brown Engineering Co. dated January 5, 1978 in the amount of $5,207.64, dated March 27, 1979 in the amount of $414.60, and dated April 27, 1979 in the amount of $7,170.00. Copies of the aforesaid checks and of the corresponding invoices of J.J. Brown Engineering Co. were offered and received into evidence as Plaintiff's Exhibits Nos. 10, 11, and 12, respectively.

10. On April 23, 1979, J. James Brown filed a voluntary petition in bankruptcy herein.

The Court Concludes and Further Finds:

1. § 17a of the Bankruptcy Act provides in pertinent part as follows:

"a. A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . .

. . . . .

(4) were created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity . . . ."

2. The word "officer" as used in the above-quoted exception to discharge extends to officers of private corporations. 8 Remington on Bankruptcy § 3368 at 256 (6th ed. 1955); see In re Bernard, 87 F.2d 705 (2d Cir. 1937); In re Hammond, 98 F.2d 703 (2d Cir. 1938).

3. The meaning of the word "misappropriation" as used in § 17a(4) is not quite as clear. Judge Learned Hand remarked in Central Hanover Bank & Trust Co. v. Herbst, 93 F.2d 510, 512 (2d Cir. 1937), that "misappropriation" is ". . . a baffling word at best in this context . . . " and that it ". . . probably carries a larger implication of misconduct than 'defalcation'

. . . ." The Second Circuit Court of Appeals had occasion to interpret the term "misappropriation" in Re Bernard, 87 F.2d 705 (2d Cir. 1937), a case in which the bankrupt had been president and director of a corporation which became insolvent and the assets of which were assigned for the benefit of its creditors. While the corporation was insolvent and knowing of its insolvency, the bankrupt transferred corporate assets to himself and his son in liquidation of their own claims against the corporation. The court held that the transfers were preferential and unlawful both under section 15 of the New York Stock Corporation Law and under general doctrines of equity, and they constituted a "misappropriation" within the meaning of § 17a of the Bankruptcy Act. Id. at 706–07.

The following year, in In re Hammond, 98 F.2d 703 (2d Cir. 1938), the Second Circuit further delineated the circumstances under which a "misappropriation" would be found to exist. The bankrupt, Harris Hammond, was a former director of Acoustic Products Company, a corporation chartered to deal in phonographs, radios, and similar products. The corporation was in need of certain patents controlled by the De Forest Company. A third corporation, W. R. Reynolds & Co., had a contract to purchase 600,000 shares of stock in the De Forest Company for $300,000 and offered Acoustic Products Company a one third participation in the purchase. Acquisition of the De Forest stock would enable Acoustic to gain control of the necessary patents. Hammond and the other directors of Acoustic accepted the offer on behalf of the corporation with the understanding that if, as was feared, Acoustic were unable to raise the $100,000 required for performance of the contract, they would assume the contract and allow the corporation the benefit of the patent rights.

Acoustic was unable to raise the money in time to perform, and the directors took over the contract, purchased the De Forest shares, and then sold them at a profit on the Curb Exchange. Acoustic went into bankruptcy and its Trustee obtained a judg-

ment against Hammond and the other directors for the amount of the profits so made. Hammond, also in bankruptcy, obtained an order restraining the Trustee of Acoustic from prosecuting proceedings to collect its judgment.

The Second Circuit reversed the restraining order on the grounds that Hammond's liability was nondischargeable under § 17a(4) of the Bankruptcy Act. The court held that the liability had been imposed upon Hammond on the principle that the rule of undivided loyalty forbids directors of a solvent corporation from taking over a corporate contract for their own profit, even when the corporation is financially unable to perform. *Id.* at 704. Hammond argued that some evil intent must accompany his misappropriation. The court acknowledged that in *Re Bernard, supra,* it had said that the misappropriation had to be the result of a known breach of duty, not to mere negligence or mistake. However, the mistake there referred to was one as to a fact and not as to a rule of law. *In re Hammond, supra* at 705. The court held that Hammond was chargeable with knowledge of the law and that his ". . . appropriation is intentional and, since it is unlawful, it is such a 'misappropriation' as, in our opinion, excepts the liability from release by a discharge in bankruptcy." *Id.*

■ To find a "misappropriation" as that term is used in § 17a(4) of the Bankruptcy Act, there must be a taking, the taking must be intentional, and it must be improper or unlawful. The clearest and most recent statement of the law on this subject was made in *In re Kovacs,* 1 B.R. 103 (D.Nev.1979), where the court, citing *In re Hammond* and *In re Bernard, supra,* propounded the following test for finding a misappropriation under § 17a(4):

"Proof must only be given as to a) the Bankrupt's fiduciary relationship with the Claimant or his position as a corporate officer, from which role the contested obligation arose, b) the actual taking of the property by or through the Bankrupt, c) the unlawful or unauthorized character of the taking, and d) the inten-

tional nature of the physical act involved, that is to say, the fact that the taking was not accidental or involuntary."
*Id.* at 106.

4. In the case *sub judice,* there is no dispute as to Bankrupt's taking the Wilton contract for himself, nor as to the intentional nature of that taking. Bankrupt was acting as an officer of Alco Communications, Inc. at the time he contracted with Wilton Corporation. This Court finds, and Bankrupt admits in his Trial Memorandum, that he was not fired until November 17, 1978 and that he contracted with Wilton Corporation while still serving as an employee of Plaintiff. Brown's contention that he was not acting as an officer or director within the meaning and purview of the Bankruptcy Act because he did not in fact exercise the traditional managerial functions associated with those positions is without merit. He testified that he was both the president and a director of Alco Communications, Inc., his correspondence indicates that he represented himself to the world as Plaintiff's president, and his employment contract provides that he was to be President of Alco Communications, Inc. ". . . and shall have the authority, duties and responsibility of such an officer."

■ 5. Further, the appropriation of the corporate opportunity in this case was unlawful. The corporate opportunity doctrine is a manifestation of the general equitable rule that an officer or director of a corporation owes it the utmost good faith and must exhibit an undivided loyalty to the corporation without conflict between this duty and his own self-interests. *Paulman v. Kritzer,* 74 Ill.App.2d 284, 219 N.E.2d 541 (1966), *aff'd,* 38 Ill.2d 101, 230 N.E.2d 262 (1967). The rule is uncompromising and is founded upon the public policy which seeks to remove all temptation by extinguishing any possibility of profit flowing from a breach of the fiduciary relation. *Id.* In the *Paulman* case, defendant was the president and a director of Kritzer Radiant Coils, Inc., a corporation engaged in the business of manufacturing and selling heating equipment. An asbestos and rub-

ber company contacted Kritzer Radiant Coils, Inc. with an offer to sell its heating division to the corporation. Defendant organized Batavia-Kritzer, Inc., personally purchased the assets of the heating division, and then assigned his interests to Batavia-Kritzer, Inc. He also purchased two tracts of real estate which the corporation would have been interested in purchasing.

The court held that when a business opportunity presents itself to an officer or director of a corporation, and the opportunity is in the line of his corporation's business, and especially if originally intended for the corporation,

" ' . . . . the law will not allow him to divert the opportunity from the corporation and embrace it as his own. . . . ' " (citing *Loft, Inc. v. Guth*, 23 Del.Ch. 138, 2 A.2d 225, 238–39 (1938)) *Paulman v. Kritzer, supra* at 543–44 (1966).

The breach of fiduciary duty by officers and directors of a corporation is controlled by the law of the state of incorporation. *See Paulman v. Kritzer, supra* at 543. While Kritzer Radiant Coils, Inc. in the *Paulman* case was a Delaware corporation, the principles referred to above have been followed in measuring the conduct of officers and directors of Illinois corporations. *See Kerrigan v. Unity Savings Association*, 58 Ill.2d 20, 317 N.E.2d 39 (1974); *Patient Care Services, S. C. v. Segal*, 32 Ill.App.3d 1021, 337 N.E.2d 471 (1975); *Northwestern Terra Cotta Corporation v. Wilson*, 74 Ill. App.2d 38, 219 N.E.2d 860 (1966).

*Patient Care Services, S. C. v. Segal, supra*, involved a situation which in many ways resembles the case under consideration. Two physicians had organized the plaintiff corporation to render medical planning services to a certain hospital. One of the physicians subsequently organized a competing corporation while still an officer and director of plaintiff. The competing corporation succeeded in obtaining a contract with the hospital to perform the services which the plaintiff corporation had been performing. The court quoted from the *Paulman* case as follows:

" 'Whether a corporate officer has seized a corporate opportunity for his own depends not on any single factor nor is it determined by any fixed standard. Numerous factors are to be weighed, including the manner in which the offer was communicated to the officer; the good faith of the officer; the use of corporate assets to acquire the opportunity; the financial ability of the corporation to acquire the opportunity; the degree of disclosure made to the corporation; the action taken by the corporation with reference thereto; and the need or interest of the corporation in the opportunity. . . . ' "

*Patient Care Services, S. C. v. Segal, supra* at 480.

7. In the instant case, the offer was originally intended for Alco Communications, Inc., and Bankrupt first learned of Wilton's interest in a new installation while working in the capacity of officer and director of Alco. The evidence has demonstrated that Bankrupt did not act in good faith in taking the Wilton Corporation offer for himself. It was Bankrupt's burden to show that " . . . his every act in dealing with the opportunities presented was in the exercise of the utmost good faith." *Paulman v. Kritzer, supra* at 545; *see Mile-O-Mo Fishing Club, Inc. v. Noble*, 62 Ill. App.2d 50, 210 N.E.2d 12, 16 (1965). Bankrupt has failed to sustain this burden.

No disclosure was made by Bankrupt of his dealings with Wilton Corporation until after he had received his first payment pursuant to the November 15 agreement. Moreover, Bankrupt never informed Plaintiff that Wilton Corporation would have contracted with Alco if Alco would offer a more suitable financing arrangement. In response to Mr. Keno's inquiries regarding the status of the Wilton job, Bankrupt, knowing that Plaintiff's offer had already been rejected, led Mr. Keno to believe that progress was being made.

Plaintiff was financially able to acquire the opportunity. Bankrupt argues that Plaintiff was unable to acquire the contract with Wilton Corporation because it could

not offer suitable financing terms. Bankrupt, however, had an obligation to use his best efforts in securing the contract for Alco Communications, Inc. *See Paulman v. Kritzer, supra* at 545–46 (1966). Robert Keno testified that Plaintiff would have been glad to negotiate acceptable terms with Wilton, but Bankrupt gave Wilton Corporation the impression that Alco would not restructure the agreement. Not only did Bankrupt fail to use his best efforts to secure the contract for Plaintiff, he actually exerted his efforts in the opposite direction, causing Plaintiff to lose the Wilton contract.

Finally, the contract was clearly in the line of Plaintiff's activities, and Plaintiff demonstrated continuing interest in procuring the Wilton contract. Bankrupt argues that Alco Communications, Inc. had lost interest in the contract, because no counter-offers were ever made to Wilton. However, there were no counter-offers because of Bankrupt's deceptive conduct and his assurances that progress was being made on the contract. This is not a case where the corporation had lost interest in the opportunity. Negotiations between Plaintiff and Wilton Corporation were ongoing when Bankrupt began to deal with Wilton on his own behalf.

■ In consideration of all these factors and in light of the public policy upon which the fiduciary duties of an officer and director are based, it is this Court's determination that J. James Brown flagrantly violated those duties to Plaintiff, Alco Communications, Inc. Bankrupt's appropriation of the business opportunity was unlawful and it was a "misappropriation" while acting as an officer within the meaning and purview of § 17a(4) of the Bankruptcy Act.

9. Where a debt is determined to be nondischargeable, it is this Court's responsibility under § 17c(3) of the Bankruptcy Act to determine the remaining issues and render judgment. A determination must therefore be made as to the amount of Plaintiff's recovery.

10. Plaintiff is not limited to recovery of the profits which accrued to Bankrupt. *See*

*Vendo Co. v. Stoner,* 58 Ill.2d 289, 321 N.E.2d 1, 10 (1974); *Henry's Drive-In, Inc. v. Anderson,* 37 Ill.App.2d 113, 185 N.E.2d 103, 108 (1962). In *Henry's Drive-In, Inc. v. Anderson, supra,* an officer of the plaintiff corporation resigned and took three of plaintiff's franchisers for his competing enterprise. The court held that the officer had breached his fiduciary duty to the corporation and stated:

"The general rule undoubtedly is that in a case such as this the damages recoverable by the plaintiff are the plaintiff's loss of profits and not what the defendant's profits or losses were."

*Id.* at 108. The court then remanded the case with directions to the trial court to determine what plaintiff's net profits would have been had its former officer not deprived it of the three franchisers. The court defined net profit as ". . . the difference between the gross receipts and the costs of running the business." *Id.* at 109.

11. Plaintiff's Exhibit No. 26, the Pricing Worksheet prepared by Bankrupt on behalf of Alco Communications, Inc., shows a "grossmark" of $27,820.82. While there was testimony that "grossmark" is equivalent to gross profit, it appears from the worksheet that the costs of performing the contract for Wilton have already been accounted for, including $12,760.00 for engineering and installation. Any other expenses, such as rent, office personnel, or supplies, would necessarily have been incurred whether or not Alco Communications, Inc. had obtained the contract with Wilton. In light of ". . . the liberal rule with reference to the proof of damages on the part of a wrongdoer . . .", *Henry's Drive-In, Inc. v. Anderson, supra* at 109; *see Vendo Co. v. Stoner, supra* at 13, it is this Court's determination that $27,820.82, the amount designated as "grossmark" on Plaintiff's Exhibit No. 26, is a reasonable estimate of the net profits which would have accrued to Plaintiff had it obtained the contract with Wilton Corporation for the engineering and installation of a telephone equipment system.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Complaint of Alco Communications, Inc. made pursuant to Section 17c(2) of the Bankruptcy Act to determine the dischargeability of debt claimed to be nondischargeable pursuant to Clause Four of Section 17a of the Bankruptcy Act be, and the same is hereby allowed; and the debt of Bankrupt, J. James Brown, to Plaintiff, Alco Communications, Inc. be, and the same is hereby declared to be nondischargeable in bankruptcy under Paragraph Three of Section 17c of the Bankruptcy Act.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff, Alco Communications, Inc. recover of Bankrupt, J. James Brown, Twenty-seven Thousand Eight Hundred Twenty Dollars and Eighty-two Cents ($27,820.82).