ANDERSON, Circuit Judge:
 

 In this bankruptcy appeal, the appellant Ronald Cross, bankrupt and defendant below, comes before us seeking the proverbial “fresh start”; his creditor, the appellee Murphy & Robinson Investment Company, seeks to be paid. Cross began his search for a “fresh start” by filing voluntary bankruptcy petitions for himself personally and for his two wholly-owned and controlled corporations, Cross Enterprises, Ltd. and Cross-Wiggins Corp. Murphy & Robinson intervened by filing a Complaint to Determine Dischargeability of Debt in the individual bankruptcy proceedings of Cross, claiming that Cross owed certain obligations to them that could not be discharged in bankruptcy. After a hearing, the bankruptcy judge determined that the debt in question was not dischargeable under § 17(a)(4) of the Bankruptcy Act, formally codified at 11 U.S.C.A. § 35(a)(4) (West 1976) (repealed).
 
 [1]
 
 The district court affirmed this determination of nondischarge-ability. We reverse.
 

 I. BACKGROUND: THE FACTS AND PROCEEDINGS BELOW
 

 Cross, through his two corporations, for which he was the president and sole shareholder, was engaged in the business of constructing residential homes. Cross attempted to expand his general contracting business into the construction of commercial buildings. He entered into a contract with the appellee to construct a Post Office building that the appellee would lease to the United States government. Cross executed the contract on behalf of Cross Enterprises in his capacity as president.
 

 
 *876
 
 Pursuant to the contract, Cross applied for and received four draws totalling $74,-682 as advances on the contract price of $86,000. Upon receiving each draw, Cross, on behalf of Cross Enterprises, signed a printed form certifying that payments had been made to subcontractors, materialmen, and laborers.
 
 [2]
 
 These draws were deposited in the business account of Cross-Wiggins Co. and were commingled with proceeds received from other jobs by Cross Enterprises and Cross-Wiggins Co.
 
 [3]
 
 Costs incurred in the Post Office job were paid out of this account, as were bills relating to other jobs and general office expenses. Although Cross Enterprises completed the Post Office building, Murphy & Robinson ultimately had to pay bills owed to subcontractors, materialmen, and laborers that amounted to $7,733.70 in excess of the contract price.
 

 Appellee contends that although the commingling of funds prevents exact tracing of the Murphy & Robinson draws, at least a portion of these draws were spent on obligations from other construction jobs, donations to charities, repayment of corporate loans personally guaranteed by Cross, a trip to Oklahoma (which appellee characterizes as personal in nature and appellant characterizes as business-related), and eyeglasses for Cross. Appellant claims that the account from which these expenditures were made also contained money deposited from other sources and that the failure to pay some of the bills from the Post Office job resulted from the job being taken at cost and from certain extra work that was required but for which appellant was not compensated.
 

 The bankruptcy judge concluded that by commingling with other monies the draws given to Cross by the appellee and by using these funds for purposes other than the payment of obligations on the Post Office job, Cross committed a defalcation within the meaning of § 17(a)(4) of the Bankruptcy Act and thus his debt to appellee is nondis-ehargeable. The district court affirmed, reasoning that the debt could not be discharged because “Ron Cross committed a defalcation by his failure to properly account for and to use the draws from Murphy & Robinson to pay those subcontractors, laborers and suppliers of the Post Office job.” As the parties agreed, however, that the judgment was too high, the district court vacated the judgment and remanded to the bankruptcy court the issue of the proper amount of the debt.
 
 [4]
 
 Cross immediately filed a notice of appeal, and appeals directly from the district court’s affirmance of the determination of nondis-chargeability.
 

 II. JURISDICTION
 

 Although neither party has raised the issue, this court must first consider whether it has jurisdiction to hear this appeal. Incumbent upon this court is the obligation to examine sua
 
 sponte
 
 the basis of our jurisdiction whenever a question arises as to its existence.
 
 Liberty Mutual Insurance Co. v. Wetzel,
 
 424 U.S. 737, 740,
 
 *877
 
 96 S.Ct. 1202, 1204, 47 L.Ed.2d 435 (1976);
 
 B. B. Adams General Contractors, Inc. v. HUD,
 
 501 F.2d 176, 177 (5th Cir. 1974).
 

 The unusual posture in which this case came to the court of appeals creates such a question. Cross appeals from the district court’s first opinion, which determined that the debt involved was nondischargeable, but also remanded the matter to the bankruptcy court for reevaluation of the amount of the debt. Ordinarily, this court is empowered to hear appeals in cases only after final judgment has been entered below.
 
 [5]
 
 Since the district court decided the dis-chargeability issue (i.e., analogous to liability) and left open for further proceedings establishing the amount of the debt (i.e., akin to damages), under conventional jurisdictional principles, this order would appear interlocutory and thus nonappealable.
 
 See Liberty Mutual Insurance Co. v. Wetzel,
 
 424 U.S. at 739, 96 S.Ct. at 1204 (partial summary judgment on liability);
 
 B. B. Adams General Contractors, Inc. v. HUD,
 
 501 F.2d at 177 (partial summary judgment);
 
 Borges v. Art Steel Co.,
 
 243 F.2d 350 (2d Cir. 1957) (partial summary judgment on liability).
 

 Congress, however, has expressly authorized interlocutory appeals in certain types of bankruptcy cases. Bankruptcy Act, § 24(a), 11 U.S.C.A. § 47(a) (West 1976) (repealed).
 
 [6]
 
 Whether or not the action of the district court is an appealable interlocutory order under this section depends on whether we are confronted with a proceeding in bankruptcy or a controversy arising in a proceeding in bankruptcy, the former being appealable without regard to finality.
 

 The apparent simplicity of this dichotomy dissolves in its application. The cases have referred to this area as a “terminalogical morass,”
 
 In re Durensky,
 
 519 F.2d 1024, 1028 (5th Cir. 1975), and the commentators have described it as “obscure,” 2 W. Collier,
 
 Bankruptcy
 
 ¶ 24.12 (14th rev.ed. 1976), and “elusive,” D. Cowens,
 
 Bankruptcy Law and Practice
 
 § 871 (2d ed. 1978). Although numerous definitions of these concepts have been attempted, applying in- specific instances the distinction between “proceedings” and “controversies” has proved problematic. Probably no single definition of these terms adequately explains the results reached in the various cases. In a widely acclaimed approach,
 
 see, e.g.,
 
 9 J. Moore,
 
 Federal Practice,
 
 ¶ 110.19[5] (2d ed. 1980), however, the Second Circuit has announced perhaps the best and most workable definition of these terms.
 
 United Kingdom Mutual Steamship Assurance Association v. Liman (In re Sea Trade Corp.),
 
 418 F.2d 9, 10 (2d Cir. 1969). As adopted by the Fifth Circuit, this distinction is:
 

 As a general rule, “proceedings” are those matters of an administrative character, including questions between the bankrupt and his creditors which are presented in the ordinary course of the administration of the bankrupt’s estate. “Controversies,” on the other hand, are usually described as matters which arise in the course of the bankruptcy proceedings and which are not mere steps in the ordinary administration of the bankrupt, but which present distinct and separable issues between the trustee and adverse claimants concerning the right and title to the bankrupt’s estate.
 

 In re Durensky,
 
 519 F.2d 1024, 1027 (5th Cir. 1975).
 
 See In re Ben Hyman & Co.,
 
 577 F.2d 966, 968 (5th Cir. 1978).
 

 According to this definition, the present matter, involving a dispute between the bankrupt and one of his creditors over whether the bankrupt is entitled to be dis
 
 *878
 
 charged of his obligations, is a “proceeding” in bankruptcy. Whether a particular debt can be discharged in bankruptcy is a question that arises in the ordinary administration of the bankrupt’s estate and does not concern the right and title to property in that estate. In
 
 Durensky,
 
 this court held that an application to determine discharge-ability of tax debts filed by the bankrupt under § 17(e)(1) of the Act, 11 U.S.C.A. § 35(c)(1) (West 1976) (repealed), was a “proceeding” in bankruptcy. Given the similarity of the issues raised, we see no reason to treat a complaint filed by a creditor to determine the dischargeability of a commercial debt any differently than an application filed by the bankrupt to determine dischargeability of a tax debt. Both cases present problems that typically arise in the ordinary administration of the bankrupt’s estate: what debts are chargeable to the bankrupt and what will be the effect of a bankruptcy judgment on these debts. Neither involves a separable and distinct dispute over rights or title to particular property in the bankrupt’s estate. This conclusion comports with the traditional view that in general “orders granting or denying a discharge or a motion to vacate a discharge” have been considered “proceedings” in bankruptcy. 2 W. Collier,
 
 Bankruptcy
 
 ¶ 24.24 (14th rev.ed. 1976).
 

 The conclusion that the matter before us is a “proceeding” in bankruptcy does not automatically confer jurisdiction to hear this interlocutory appeal. Despite the unqualified language of § 24(a) of the Act, that provision has been construed to require that an interlocutory order must possess a “definitive operative finality” to be appeal-able as a matter of right to this court.
 
 In re Durensky,
 
 519 F.2d 1024, 1028-29 (5th Cir. 1975);
 
 Fruehauf Corp. v. Revitz (In re Transystems, Inc.),
 
 499 F.2d 416 (5th Cir. 1974);
 
 United States v. Brock (In re Wingreen Co.),
 
 412 F.2d 1048, 1050 (5th Cir. 1969). This judicial gloss on the statute has been imposed to avoid the flood of appeals and the disruption of the “reasonably swift resolution of pressing economic difficulties” that would occur “if every word issuing from the bankruptcy judge’s mouth or pen were to be a proper subject for review by the district court and by the court of appeals.”
 
 In re Durensky,
 
 519 F.2d at 1028.
 

 In
 
 Durensky,
 
 the government challenged in the district court a ruling by the bankruptcy court that it had jurisdiction over a claim concerning the dischargeability of the bankrupt’s tax liability. The district court remanded the case to the bankruptcy court for a decision on the merits after rejecting the jurisdictional challenge and concluding that the appeal to the district court was premature. An appeal to this court was dismissed because the district court’s order lacked “definitive operative finality.” We similarly dismissed the appeal in
 
 Transys-tems
 
 where the district court remanded the matter to the bankruptcy court with instructions to apply state, rather than federal, law in resolving a particular issue. In neither
 
 Transystems
 
 nor
 
 Durensky
 
 had the district court actually passed on the merits of any claim in the case; both involved a remand to the bankruptcy court for consideration of the merits following a decision by the district court on a procedural issue (i.e., jurisdiction, choice of law).
 
 [7]
 

 In contrast to
 
 Durensky
 
 and
 
 Tran-systems,
 
 the decision of the district court here definitively disposed of the merits of the entire issue now appealed to this court. The district court conclusively determined that the debt was nondischargeable. The district court was not likely to reexamine, nor did it in fact reexamine, this holding.
 
 *879
 
 Although a finding that the amount owed was nothing would have obviated the need for this appeal, even the defendant-bankrupt conceded that the debt amounted to at least some $7,600. To hold that the district court’s resolution of the dischargeability issue lacked “definitive operative finality” would eviscerate the express provision established by Congress to authorize these interlocutory appeals. If the decision here appealed lacks “definitive operative finality,” we would be hard pressed to identify one that would not be so deficient, shy of an actual final order. The judicial gloss on the authorization of interlocutory appeals in proceedings in bankruptcy would thus become a judicial repeal of that congressional authorization. We hold, therefore, that the district court decision on dischargeability was an appealable interlocutory order under § 24(a) of the Bankruptcy Act. We now turn to the merits of this appeal.
 

 III. THE MERITS
 

 As a general rule, a discharge in bankruptcy will release the bankrupt from all provable debts with the exception of a few narrowly defined types of obligations. One such exception exists for debts “created by ... misappropriation or defalcation while acting as an officer or in any fiduciary capacity.” Bankruptcy Act, § 17(a)(4), 11 U.S.C.A. § 35(a)(4) (West 1976) (repealed). The bankruptcy and district courts focused on the question of whether the acts committed by Cross constituted a “defalcation” within the meaning of § 17(a)(4).
 
 [8]
 
 Both courts concluded that § 17(a)(4) would apply because Cross was a corporate officer. The lower courts did not consider whether § 17(a)(4) also requires that the bankrupt owe a fiduciary duty
 
 to the claimant
 
 that exists prior to and independent of the alleged misconduct, as would be the case where a corporation seeks to hold its own bankrupt officer accountable for his misappropriations or defalcations of corporate funds
 
 {i.e.,
 
 whether § 17(a)(4) applies to officers only when their corporation or other fiduciary beneficiary is the claimant). We hold that § 17(a)(4) does so require the claimant to be the beneficiary of a preexisting fiduciary relationship, and we therefore reverse the decision of the district court.
 
 [9]
 

 The overriding purpose of the bankruptcy laws is to provide the bankrupt with comprehensive, much needed relief from the burden of his indebtedness by releasing him from virtually all his debts.
 
 Perez v. Campbell,
 
 402 U.S. 637, 648, 91 S.Ct. 1704, 1710, 29 L.Ed.2d 233 (1971);
 
 Hartman v. Utley (In re Schroeder & Co.),
 
 335 F.2d 558, 560 (9th Cir. 1964);
 
 Hardie v. Swafford Brothers Dry Goods Co.,
 
 165 F. 588, 590-91 (5th Cir. 1908).
 
 [10]
 
 To this end, the courts have narrowly construed excep
 
 *880
 
 tions to discharge against the creditor and in favor of the bankrupt.
 
 Gleason v. Thaw,
 
 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915);
 
 In re Vickers,
 
 577 F.2d 683, 687 (10th Cir. 1978);
 
 Davison-Paxon Co. v. Caldwell,
 
 115 F.2d 189, 191 (5th Cir. 1940);
 
 In re Knight,
 
 421 F.Supp. 1387, 1391 (M.D.La.1976),
 
 aff’d without opinion,
 
 551 F.2d 862 (5th Cir. 1977).
 
 [11]
 
 Accordingly, the burden of proof lies with the creditor to demonstrate that the particular debt falls within one of the statutory exceptions.
 
 Danns v. Household Finance Corp.,
 
 558 F.2d 114, 116 (2d Cir. 1977);
 
 Kelley v. Conwed Corp.,
 
 429 F.Supp. 969, 972-73 (E.D.Va.1977); Bankruptcy Rule 407; 1A W. Collier,
 
 Bankruptcy,
 
 ¶ 17.24[5] (14th rev.ed. 1978). The exceptions to discharge found in § 17(a)(4) were designed to prevent the bankrupt from avoiding through bankruptcy the consequences of certain wrongful acts by providing protection to a certain preferred class of creditors. The exceptions to discharge were not intended and must not be allowed to swallow the general rule favoring discharge.
 

 For a debt to be nondischargeable under this section, the creditor must be among this protected class; an officer’s unfaithfulness to or mismanagement of his corporation will not give rise to nondis-chargeable liability directly to individual creditors of the corporation. A contrary rule would be unduly burdensome on the bankrupt and inconsistent with the basic policies underlying the Act. Where an officer breaches a fiduciary duty owed to his corporation, but the claimant under § 17(a)(4) is a corporate creditor, the amount sought to be declared nondischargeable may have little or no relation to the amount of the defalcation. In the present matter, the debt declared nondischargeable exceeded $7,700, but there was little proof on the amount of the defalcation by Cross. In an analogous context, the Second Circuit has held that, in accordance with the strict construction given to exceptions to discharge, only that portion of the debt affected by the wrongdoing would be rendered nondischargeable.
 
 Danns v. Household Finance Corp.,
 
 558 F.2d 114, 116 (2d Cir. 1977) (under § 17(a)(2) [money obtained by false representations], “a creditor should be entitled to bar discharge only of that portion of his loan as was obtained fraudulently.”).
 
 See also In re Vickers,
 
 577 F.2d 683 (10th Cir. 1978);
 
 In re Knight,
 
 421 F.Supp. 1387 (M.D.La.1976),
 
 aff’d without opinion,
 
 551 F.2d 862 (5th Cir. 1977). Moreover, permitting a single corporate creditor to have his debt declared nondischargeable in the officer’s individual bankruptcy could possibly interfere with the recovery sought by the corporation itself against the delinquent officer, and thus would be unfair to the corporation and other corporate creditors. The preferable approach would be to allow the corporation (or its trustee in bankruptcy) to assert a claim based on the defalcation that would inure to the benefit of all the corporation’s creditors.
 
 See In re Whitlock,
 
 449 F.Supp. 1383, 1388-89 (W.D.Mo.1978);
 
 Kelley v. Conwed Corp.,
 
 429 F.Supp. 969, 971-73 (E.D.Va.1977).
 

 Our conclusion about the dischargeability of this debt is supported by this court’s
 
 *881
 
 recent decision in
 
 In re Angelle,
 
 610 F.2d 1335 (5th Cir. 1980).
 
 Angelle
 
 presented facts virtually identical to those of this case, except that there the bankrupt was doing business in his own capacity rather than through a corporate entity. Angelle received advances from various buyers for the purpose of constructing homes for them. Angelle commingled these funds in a single business account, went bankrupt, and left these buyers with substantial additional expenses necessary to complete their houses. The buyers sought to have these debts declared nondischargeable under § 17(a)(4) in Angelle’s voluntary bankruptcy on the ground that these debts “were created by his ... misappropriation ... while acting ... in a fiduciary capacity.” We held that Angelle was not acting in a fiduciary capacity as required by § 17(a)(4) because he was not subject to a “technical trust . . . [which] must exist prior to the act creating the debt and without reference to that act.”
 
 Id.
 
 at 1338.
 
 See Davis v. Aetna Acceptance Co.,
 
 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934);
 
 Chapman v. Forsyth,
 
 2 U.S. (How.) 202, 207, 11 L.Ed. 236 (1844). As Angelle owed no express, preexisting fiduciary duty to his creditors asserting claims under § 17(a)(4), that section was no barrier to his discharge in bankruptcy.
 
 Accord In re Pedrazzini,
 
 644 F.2d 756 (9th Cir. 1981).
 

 Similarly, Cross (and his companies) owed no fiduciary duty to the appellee that existed prior to and independent of his alleged misconduct. Counsel for appellee conceded at oral argument that Cross was under no obligation to maintain a segregated account for the draws received from appellee. Appellee, despite bearing the burden of proof as plaintiff below, did not introduce into evidence the contract for the construction of the Post Office, nor any other documents that would establish a fiduciary relationship.
 
 [12]
 
 We are unaware of any Georgia law that would impose trust obligations on general contractors in these circumstances.
 
 See Carey Lumber Co. v. Bell,
 
 615 F.2d 370 (5th Cir. 1980).
 
 [13]
 

 Thus, Cross, like Angelle, cannot be considered a fiduciary for the benefit of this
 
 *882
 
 claimant within the meaning of § 17(a)(4). Yet, appellee would have us distinguish the
 
 Angelle
 
 case and hold that § 17(a)(4) nonetheless applies merely because Cross was a corporate officer. Hence, the fortuity of a small businessman deciding whether or not to incorporate would determine whether his business’ debts would be dischargeable should the venture fail. The creditor’s interests are the same regardless of whether the debtor has incorporated or not, and in neither ease is the Act’s policy of protecting beneficiaries of fiduciary relationships implicated. Appellee’s proposition would serve none of the policies of the Bankruptcy Act, and would undermine the Act’s primary purpose of providing relief to the honest debtor. We decline to fashion such an anamolous rule.
 
 [14]
 

 Our conclusion that § 17(a)(4) does not bar the discharge of this debt finds support in the decisions of courts from other circuits.
 
 In re Whitlock,
 
 449 F.Supp. 1383 (W.D.Mo.1978);
 
 Kelley v. Conwed Corp.,
 
 429 F.Supp. 969 (E.D.Va.1977). Both these cases held, on facts very similar to the instant matter, that creditors of the corporation could not assert corporate debts as nondisehargeable in the officer’s individual bankruptcy.
 
 [15]
 

 IV. CONCLUSION
 

 In sum, we have jurisdiction to entertain this interlocutory appeal from an order in a proceeding in bankruptcy. That order possesses sufficient definitive operative finality to be appealable. The district court and bankruptcy court erred in determining that the debts owed to the corporate creditor were nondisehargeable in the individual bankruptcy of the appellant. Section 17(a)(4) of the former Bankruptcy Act is inapplicable in this case because the bankrupt did not owe the claimant any fiduciary duty. The judgment of the district court is reversed and the case remanded for further proceedings not inconsistent with this opinion.
 

 REVERSED AND REMANDED.
 

 [1]
 

 . This action was commenced before October 1, 1979, and therefore the former Bankruptcy Act controls this case.
 
 See
 
 Bankruptcy Reform Act of 1978, Pub.L. No. 95-598, § 402, Title IV, 92 Stat. 2682 (1978). Section 17(a)(4) of the former Bankruptcy Act provides in pertinent part:
 

 A discharge in bankruptcy shall release a bankrupt from all his provable debts, whether allowable in full or in part, except such as ... were created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity. .. .
 

 [2]
 

 . Cross contends that the appellee was aware of the financial infirmity of Cross’ businesses and consequently did not rely on the certification contained on the printed form. Reply Brief of Appellant at 12. In light of our holding,
 
 infra,
 
 that no express trust relationship between the parties has been established, whether or not there was reliance on these certifications is irrelevant.
 

 [3]
 

 . The evidence showed that Cross tended to treat his two corporations as a single business, and that although Cross Enterprises was the contracting party, draws were deposited to and payments were made out of the account of Cross-Wiggins Co.
 

 [4]
 

 .The bankruptcy court originally found the debt to be $28,918.24. On remand, the bankruptcy judge determined the amount to be $7,733.70. The matter was again appealed to the district court and again remanded to the bankruptcy court, this time for failure to provide a sufficient record to allow proper review by the district court. On the second remand, the bankruptcy court amplified its findings of facts and conclusions of law and reinstated judgment for Murphy & Robinson in the amount of $7,733.70. Murphy & Robinson appealed the matter to the district court for a third time and the court dismissed the appeal as untimely. The notice of appeal filed by Cross as to the district court’s first opinion in the case is the only one before us.
 

 [5]
 

 . 28 U.S.C.A. § 1292(b) (West 1976), which authorizes certain interlocutory appeals upon certification from the district court, is a conspicuous exception to this general rule. As no such certification has been made in this case, the provisions of that section are inapplicable here. The exceptions found in § 1292(a) to the finality requirement for cases involving injunctions, receivers, admiralty, and patent infringement are likewise inapposite.
 

 [6]
 

 . This section provides in pertinent part that: The United States court of appeals, . .. are invested with appellate jurisdiction from the several courts of bankruptcy in their respective jurisdictions in proceedings in bankruptcy, either interlocutory or final, and in controversies arising in proceedings in bankruptcy... .
 

 [7]
 

 . In
 
 Wingreen,
 
 an order of mandamus entered by the district court compelling the IRS to conduct an audit of the bankrupt was found to have sufficient “definitive operative finality” to be appealable under § 24. The posture of that case, presenting on appeal an order that originated in the district court rather than the district court’s review of a decision by the bankruptcy court, therefore, differs from this case and from
 
 Durensky
 
 and
 
 Transystems.
 
 Yet, with regard to definitive operative finality, the district court’s order in
 
 Wingreen,
 
 like the present case and unlike
 
 Durensky
 
 and
 
 Transys-tems,
 
 represented a final determination of a distinct ultimate issue, rather than merely a threshold procedural step toward the resolution of an ultimate issue.
 

 [8]
 

 . In light of our resolution in this case, we need not decide, and indeed express no opinion regarding, whether on these facts Cross committed any “defalcation” within the meaning of § 17(a)(4).
 

 [9]
 

 . The lower courts also did not address, and the appellee has offered no explanation for, why the debt of the corporation could be asserted in the individual bankruptcy of Cross. Typically, in cases raising issues similar to those in this case, the bankrupt will have personally guaranteed the. corporate debt or performance — thus, the debt is properly his as well as the corporation’s. See,
 
 e.g., Kelley v. Conwed Corp.,
 
 429 F.Supp. 969, 971 (E.D.Va.1977). No such allegation of a personal guaranty by Cross has been made or proved in this case. Another theory of personal liability would require piercing the corporate veil of Cross’ small, closely-held corporation. Yet, such a theory of Cross’ personal liability for the debt would be inconsistent with the appellee’s position on why the debt is nondischargeable (i.e., because Cross was a corporate officer when he committed the alleged defalcation). If Cross owed a fiduciary duty to the appellee, then he could be personally liable for a debt created by a breach of that duty. Given our conclusion on the applicability of § 17(a)(4) and the failure of the parties to argue and the lower courts to address the propriety of asserting this debt in Cross’ personal bankruptcy, we need not and do not decide whether Cross can be held personally liable for this debt.
 

 [10]
 

 .This court in the
 
 Hardie
 
 case observed:
 

 Originally, in bankrupt laws, the discharge of the bankrupt may have been incidental, and the main purpose the equal distribution of his goods among creditors; but to say it now, and of the present law, we must shut our eyes to the actual practice in our courts. In nearly all and every voluntary bankruptcy brought under the present law the administration or distribution of the bankrupt’s property has been practically concluded before
 
 *880
 
 filing petition, and the sole object of the petitioner is to be relieved of his debts, and in number the voluntary cases are about four to one of the involuntary. See Report, Dept, of Justice, 1907. And the same may be said of the voluntary cases under the act of March 2, 1867, c. 176, 14 Stat. 517, which was passed mainly to relieve the unfortunate debtors ruined by and through the vicissitudes of the great Civil War.
 

 For these considerations, we are disposed to deny that in the present bankruptcy law the discharge of the honest debtor is a mere incident which could have been omitted without impairing its symmetry and efficiency; and, on the contrary, to assert that the release of the honest, unfortunate, and insolvent debtor from the burden of his debts and restore him to business activity, in the interest of his family and the general public, is one of the main, if not the most important, objects of the law.
 

 Id.
 

 [11]
 

 . This court has refused to follow a holding in
 
 Knight
 
 on an unrelated point (j.e., the district court’s standard for review of decisions by the bankruptcy judge) because that ruling was contrary to Supreme Court precedent.
 
 In re Perimeter Park Investment Associates, Ltd.,
 
 616 F.2d 150, 151 (5th Cir. 1980). The holding in
 
 Knight
 
 on the point for which it is cited here, however, is undoubtedly correct.
 

 [12]
 

 . The printed forms signed by Cross upon receipt of each draw certifying that subcontractors, materialmen and laborers had been paid are not sufficient to bind Cross as a fiduciary. Those documents impose no specific fiduciary obligations
 
 (e.g.,
 
 segregation of funds, holding money in trust) and contain none of the language traditionally used to create an express, technical trust. Absent evidence revealing a clear manifestation of intent to create a trust or the imposition of specific fiduciary duties,
 
 An-gelle
 
 instructs us that the requirement of a fiduciary relationship under § 17(a)(4) has not been met. 610 F.2d at 1338^0. Appellee has failed to carry its burden of proof.
 
 See supra,
 
 text following n.ll.
 

 [13]
 

 . The appellee’s reliance on
 
 Carey Lumber
 
 is misplaced. In that case, the bankrupt contractors’ debts to his customer-creditors were held nondischargeable under § 17(a)(4) only because the Oklahoma Lien Trust Statutes imposed express fiduciary duties on the contractor for the benefit of the home buyer. No such Georgia statute has been cited. Indeed, the bankrupt in
 
 Carey Lumber
 
 was also doing business through a small corporation for which he was the managing officer. The court could have, but did not, predicate its conclusion that the debts were nondischargeable on appellee’s theory that § 17(a)(4) applies by virtue of the bankrupt being a corporate officer.
 

 Ga.Code Ann. § 26-1808.1 (1978), which makes misapplying with intent to defraud money advanced for real property improvements a crime, does not create a trust relationship for the purposes of § 17(a)(4). The argument that a similar Louisiana criminal statute did so render the bankrupt a fiduciary was rejected by
 
 In re Angelle,
 
 610 F.2d at 1339-41. Such criminal laws, if they can be said to give rise to any trust responsibilities at all, do so at the time of and by virtue of the bankrupt’s misconduct. Thus, no technical trust existing prior to without reference to the misconduct, as required by
 
 Angelle, Chapman
 
 and
 
 Davis,
 
 is created by these criminal laws.
 

 For the same reasons, the Georgia lien law, Ga.Code Ann. § 67-2001
 
 et seq.
 
 (Supp.1981), which has been cited by neither party, does not give rise to the sort of fiduciary obligations contemplated by
 
 Angelle
 
 and § 17(a)(4). The Georgia statute is very similar in structure and operation to the Louisiana lien law, La.Rev. Stat.Ann. 9:4801 (West Supp.1981), that
 
 An-gelle
 
 deemed insufficient to establish the necessary trust obligations. 610 F.2d at 1338 n.5, 1341 n.15. Both of these statutes permit subcontractors, materialmen, laborers, and others who are not paid by the general contractor to secure a lien against the property that has been improved by their efforts. The owner of the improved property may be held personally lia
 
 *882
 
 ble to these unpaid laborers and suppliers. Neither of these laws, in contrast to the Oklahoma Lien Trust Statutes, provides that monies received by the general contractor from the property owner “ ‘shall ... be held as trust funds for the payment of all lienable claims due and owing or to become due and owing ... by reason of such building or remodeling contract.’ ”
 
 Carey Lumber Co. v. Bell,
 
 615 F.2d at 373 n.2.
 
 See also Id.
 
 at 373-75.
 

 [14]
 

 . We note that the new Bankruptcy Code has modified the language of § 17(a)(4) of the former Act by now excepting from discharge debts “for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny ....” 11 U.S.C.A. § 523(a)(4) (West 1979). Thus, the reference to “officers” in the old provision has been deleted from the statute. The legislative history does not indicate that any substantive change in the scope of the exception with regard to fiduciaries and officers was intended.
 
 See
 
 S.Rep.No.989, 95th Cong., 2d Sess. 79,
 
 reprinted in
 
 [1978] U.S.Code Cong. & Ad.News 5787, 5864; H.R.Rep.No.595, 95th Cong., 1st Sess. 364,
 
 reprinted in
 
 [1978] U.S.Code Cong. & Ad.News 5963, 6320; 124 Cong.Rec.H. 11089 (1978) (remarks of Rep. Edwards); 124 Cong.Rec.S. 17406 (1978) (remarks of Sen. DeConcini). Apparently, Congress believed that the reference to “while acting as an officer or in any fiduciary capacity” was redundant given that an officer’s liability under § 17(a)(4) extended only to claims by his corporation or another trust beneficiary.
 
 See
 
 3 W. Collier, Bankruptcy ¶ 523.14 n.l (15th rev.ed. 1981) (“the omission is without significance because an officer who misappropriates funds of a corporation is acting in a fiduciary capacity and despite deletion of the word ‘officer,’ the debt would be nondisehargeable.”)
 

 [15]
 

 . This circuit’s decision in
 
 John P. Maguire & Co. v. Herzog,
 
 421 F.2d 419 (5th Cir. 1970), is not to the contrary. In that case, the court did not address the issue before us,
 
 i.e.,
 
 whether § 17(a)(4) applies to a corporate creditor’s claim in the officer’s individual bankruptcy solely because of the bankrupt status as an officer. The
 
 Herzog
 
 court merely rejected the bankrupt’s argument that § 17(a)(4) was inapplicable because the obligation to the creditor was contractual. Moreover, the creditor in
 
 Herzog
 
 provided financing through trust receipts and other chattel paper for a retail furniture store’s floor stock. Part of the proceeds from sales of this furniture was to be held by the bankrupt company for the creditor and then remitted to the creditor on a periodic basis. The bankrupt misapplied these receipts to reduce other corporate indebtedness for which he was personally secondarily liable. Based on the trust receipts and other circumstances of that case, a preexisting trust relationship between the creditor and the bankrupt and his company could be said to have existed.