**In the Matter of Laverne B. ARCHER, Debtor.**

**Edwin D. Archer, Plaintiff,**

**v.**

**Laverne B. Archer, Defendant.**

**Bankruptcy No. 99–30009 RFH. Adversary No. 99–3017.**

United States Bankruptcy Court, M.D. Georgia, Athens Division.

Aug. 24, 2001.

John W. Timmons, Jr., Athens, GA, for Plaintiff.

Lee P. Morgan, Athens, GA, for Defendant.

## MEMORANDUM OPINION

ROBERT F. HERSHNER, Jr., Chief Judge.

Edwin D. Archer, Plaintiff, filed on April 9, 1999, a Complaint Objecting to Discharge and to Determine Dischargeability of Certain Debts. Laverne B. Archer, Defendant, filed a response on May 10, 1999. Plaintiff's complaint came on for trial on June 19, 2001. The Court, having considered the evidence presented and the arguments of counsel, now publishes this memorandum opinion.

## FINDINGS OF FACT

Plaintiff and Defendant were married in 1976. Plaintiff and Defendant are hairdressers. Plaintiff and Defendant began working in the same hairdressing business around 1990. Plaintiff and Defendant made good incomes while working together. Plaintiff and Defendant had marital problems and separated in February of 1996.[1] Defendant filed a complaint for divorce in state court. Plaintiff and Defendant continued to live in the marital residence and to work in their hairdressing business.

The state court entered, in the divorce proceeding, a Temporary Consent Order on April 11, 1996. The order provided, in part, that Plaintiff and Defendant were entitled to share, in a peaceful manner, the marital residence and their hairdressing business. The order "restrained and enjoined" Plaintiff and Defendant from selling, transferring, or encumbering any of their assets, including their marital assets.

Defendant moved out of the marital residence in October of 1996.[2] Plaintiff continued to live in the marital residence. Defendant left the hairdressing business that she shared with Plaintiff. Plaintiff closed the hairdressing business about one month later and went to work at a different hairdressing business.

First Investors Mortgage Company held the mortgage on the marital residence. The mortgage had a balance of about $47,000 in September of 1997. Defendant, in violation of the Temporary Consent Order, refinanced the mortgage. Defendant signed a deed to secure debt dated September 23, 1997, in favor of Finance America Corporation. The principal amount of the new mortgage was $56,200. Defendant received net proceeds of about $8,000. Defendant testified that she used the $8,000 to pay bills and to set up her new hairdressing business. Defendant's efforts to establish her own hairdressing business were not very successful.

Defendant, again in violation of the Temporary Consent Order, refinanced the

---

1. *See* Plaintiff's Exhibit 8—Separation Agreement, p. 1.

2. *See* Plaintiff's Exhibit 10, p. 1 (Plaintiff in sole possession since October of 1996).

mortgage held by Finance America Corporation. Defendant signed two deeds to secure debt dated December 19, 1997, in favor of EQ Financial, Inc.[3] The principal amounts of the mortgages were $60,000 and $15,000. Defendant again received net proceeds of about $8,000. Defendant does not clearly remember what happened to the $8,000. Defendant made a number of false representations to EQ Financial, Inc. Defendant represented that she was in exclusive possession of the marital residence, that she would occupy the property as her primary residence, and that she was not a judgment debtor in a certain civil action.

Defendant admits that she did not tell Plaintiff when she refinanced the mortgages in September and December of 1997. Plaintiff testified that neither he nor Defendant made any payments on the mortgages after the refinancing.

Plaintiff and Defendant signed a Separation Agreement that was filed in the divorce proceeding in state court on January 13, 1998. The Separation Agreement provides, in part, that Defendant was to convey her interest in the marital residence to Plaintiff. Plaintiff was to be responsible for the monthly mortgage payments to First Investors Mortgage Company.[4]

Plaintiff and Defendant owed a tax obligation to the Internal Revenue Service for the years 1993, 1994, and 1995. The obligation arose from the profits of their hairdressing business. The obligation, as of August 27, 1997, totaled $14,255.95. Plaintiff and Defendant reached an agreement with the IRS that called for monthly payments of $250 until the obligation was satisfied. The Separation Agreement provided that Plaintiff was to pay one-half of the obligation by making monthly payments of $250 to the IRS.[5] After Plaintiff satisfied his part of the obligation, Defendant was to make monthly payments of $250 to the IRS until the remainder of the obligation was paid in full, including any additional penalties and interest that accrued after August 27, 1997.

Plaintiff eventually learned that Defendant had refinanced the mortgage on the marital residence. Plaintiff filed a motion for contempt in the divorce proceeding. The state court entered an order on November 16, 1998, finding Defendant to be in willful contempt of the Temporary Consent Order by refinancing the marital residence. The state court noted that the refinancing had increased the debt on the marital residence by $27,000.[6] The state court ordered Defendant to make all payments on the mortgages held by EQ Financial, Inc.

Defendant filed for relief under Chapter 7 of the Bankruptcy Code on January 5, 1999. This Court entered an order on October 20, 1999, granting relief from the automatic stay to allow the divorce proceeding between Plaintiff and Defendant to continue in state court.

Plaintiff added EQ Financial, Inc. and First Greensboro Home Equity, Inc. as third-party defendants in the divorce proceeding. Plaintiff testified that he has

3. EQ Financial, Inc. has assigned the deeds to secure debt to First Greensboro Home Equity, Inc.

4. This provision of the Separation Agreement shows that Plaintiff was not aware that Defendant had refinanced the mortgage on the marital residence.

5. Plaintiff had already made a number of payments to the IRS. See Plaintiff's Exhibit 8, Separation Agreement, p. 4.

6. The balance owed on the mortgage held by First Investors Mortgage Company, prior to the refinancing, was about $47,000. The balance owed on the mortgages held by EQ Financial, Inc. was about $75,000.

reached a proposed settlement with the third-party defendants.[7] The proposed settlement calls for First Greensboro to release the deeds to secure debt signed by Defendant on December 19, 1997. Plaintiff is to sign a promissory note and deed to secure debt in favor of First Greensboro for the mortgage balance that was owed prior to the refinancing, $47,122.80, plus certain closing costs and interest. Simply stated, the debt on the marital residence is to be returned to the same amount as before the refinancing.

The state court entered an order in the divorce proceeding on February 23, 2001. The state court held that Defendant's actions in refinancing the marital residence were fraudulent and in contempt of the Temporary Consent Order. The state court held that Defendant's "fraudulent actions were done deliberately in bad faith." The state court found that Defendant's fraudulent actions had caused the unnecessary expansion of an otherwise relatively uncomplicated divorce action. The state court further found that Plaintiff had incurred additional attorney's fees because of Defendant's fraud and contemptuous behavior.

The state court held that Plaintiff had made his payments on the obligation owed to the IRS, but that Defendant had not made her payments.[8] The state court noted that Plaintiff had paid $3,357 to the IRS in excess of his obligation under the Separation Agreement. The state court ordered Defendant to reimburse Plaintiff that amount. Plaintiff paid the $3,357 to the IRS after Defendant filed for bankruptcy relief.[9]

The state court ordered Defendant, because of her contempt and fraud, to pay attorney's fees of $16,630.10 to Plaintiff's attorney. This amount represents $5,687.98 for prepetition legal services and $10,942.12 for postpetition legal services.[10]

The state court has not yet granted a divorce to Plaintiff and Defendant. Defendant has conveyed her interest in the marital residence to Plaintiff.

Plaintiff and Defendant have no children from their marriage.[11] Plaintiff is sixty-nine years old. Plaintiff retired about two years ago. Plaintiff lives in the marital residence. Plaintiff believes that the marital residence may be worth $70,000.

### CONCLUSIONS OF LAW

Plaintiff filed an adversary proceeding, contending that certain obligations of Defendant are nondischargeable under section 523(a)(2)(A), (5), (6), and (15) of the Bankruptcy Code.[12] Plaintiff also contended that Defendant should be denied a discharge under section 727(a)(2), (3), (4)(B), and (5) of the Bankruptcy Code.[13] Some of Plaintiff's contentions were resolved in the divorce proceeding. Plaintiff's counsel, at the trial of this adversary proceeding, announced that the only issues remaining for trial were Defendant's obligations to pay Plaintiff's attorney's fees of $16,630.10

7. Plaintiff's counsel noted at the trial of this adversary proceeding that the state court judge has not yet signed the settlement order.

8. Defendant testified at trial that she had made no payments on the obligation owed to the IRS.

9. Evidence Supplement Responding to the Court's Request for Clarification (filed June 19, 2001).

10. *Id.*

11. Plaintiff's Exhibit 8, Separation Agreement, p. 1.

12. 11 U.S.C.A. § 523(a)(2)(A), (5), (6), (15) (West 1993 & Supp.2001).

13. 11 U.S.C.A. § 727(a)(2), (3), (4)(B), (5) (West 1993).

and to reimburse the $3,357 that Plaintiff had paid to the IRS.[14] Plaintiff contends that these obligations are nondischargeable under section 523(a)(5)(B) of the Bankruptcy Code. This section provides as follows:

§ 523. **Exceptions to discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—

. . . .

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support;

11 U.S.C.A. § 523(a)(5)(B) (West 1993 & Supp.2001).

■ Plaintiff has the burden of proving all facts essential to support his objection to dischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ "The validity of a creditor's claim [against a bankruptcy debtor] is determined by rules of state law. Since 1970, however, the issue of nondischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code." *Grogan v. Garner*, 111 S.Ct. at 657–58.

■ Exceptions to dischargeability are to be construed strictly. *Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir.1986). "The exceptions to discharge were not intended and must not be allowed to swallow the general rule favoring discharge." *Murphy & Robinson Investment Co. v. Cross (In re Cross)*, 666 F.2d 873, 880 (5th Cir. Unit B 1982).

In *Cummings v. Cummings*,[15] the Eleventh Circuit Court of Appeals stated, in part, as follows:

Pursuant to § 523(a)(5), "a given domestic obligation is not dischargeable if it is 'actually in the nature of' alimony, maintenance, or support." *In re Harrell*, 754 F.2d 902, 904 (11th Cir.1985). Whether a given debt is in the nature of support is an issue of federal law. *In re Strickland*, 90 F.3d 444, 446 (11th Cir. 1996). Although federal law controls, state law does "provide guidance in determining whether the obligation should be considered 'support' under § 523(a)(5)." *Id.* To make this determination a bankruptcy court should undertake "a simple inquiry as to whether the obligation can legitimately be characterized as support, that is, whether it is in the *nature* of support." *In re Harrell*, 754 F.2d at 906.

In conducting this inquiry, a court cannot rely solely on the label used by the parties. As other courts have recognized, "it is likely that neither the parties nor the divorce court contemplated the effect of a subsequent bankruptcy when the obligation arose." *In re Gianakas*, 917 F.2d 759, 762 (3d Cir.1990)

---

**14.** Since Plaintiff abandoned his contention that Defendant should be denied a discharge under section 727 at trial, Bankruptcy Rule 7041 does not apply.

**15.** 244 F.3d 1263 (11th Cir.2001).

(citation omitted). The court must therefore look beyond the label to examine whether the debt actually is in the nature of support or alimony. *Id.* A debt is in the nature of support or alimony if at the time of its creation the parties intended the obligation to function as support or alimony. *See In re Brody,* 3 F.3d 35, 38 (2d Cir.1993); *In re Sampson,* 997 F.2d 717, 723–24 (10th Cir.1993); *In re Davidson,* 947 F.2d 1294, 1296–97 (5th Cir.1991); *In re Gianakas,* 917 F.2d at 762; *Tilley v. Jessee,* 789 F.2d 1074, 1077 (4th Cir.1986); *Shaver v. Shaver,* 736 F.2d 1314, 1316 (9th Cir.1984); *Williams v. Williams,* 703 F.2d 1055, 1057–58 (8th Cir.1983). Thus, "the party seeking to hold the debt nondischargeable has the burden of proving by a preponderance of the evidence that the parties intended the obligation as support...." *In re Sampson,* 997 F.2d at 723.

. . . .

[T]he touchstone for dischargeability under § 523(a)(5) is the intent of the parties. *See In re Sampson,* 997 F.2d at 723. In determining whether a particular obligation is in the nature of support, "[a]ll evidence, direct or circumstantial, which tends to illuminate the parties subjective intent is relevant." *In re Brody,* 3 F.3d at 38.

244 F.3d at 1265–66.

Plaintiff contends that Defendant's obligation to pay his attorney's fees of $16,630.10 is nondischargeable. The state court's order filed on February 23, 2001, provided, in part, as follows:

Due only to her fraudulent actions with respect to the EQ Financial transactions, the [Defendant] caused the unnecessary expansion of what should have been a relatively uncomplicated divorce action. The [Plaintiff] was practically forced to add third party defendants and litigate against them in order to protect his position with respect to the property. He had bargained for that position in good faith in negotiations with the [Defendant]. The [Plaintiff] incurred additional attorney's fees which would never have been incurred, but for the [Defendant's] fraud and contemptuous behavior.

. . . .

The [Defendant] is ordered, because of her contempt and fraud, to pay attorney's fees in the amount of $16,630.10 to attorney John W. Timmons, Jr. on or before 4:30 P.M[.], March 19, 2001, by delivering said amount in certified funds to the offices of Timmons, Haggard & Carney. Failure to deliver these funds by that date shall result in an order for the [Defendant's] incarceration in the common jail of Clarke County until such time as she shall purge herself of contempt by rendering such payment. The Court notes that it reserved the issue of sanctions when issuing the Order of November 13, 1998.

■ An obligation to pay attorney's fees is nondischargeable if the award "is actually in the nature of alimony, maintenance, or support" as that term is used in section 523(a)(5). *Olsommer v. Olsommer (In re Olsommer),* Ch. 7 Case No. 99–54055 RFH, Adv. No. 00–5012 (Bankr.M.D.Ga. Dec. 28, 2000); *see also Strickland v. Shannon (In re Strickland),* 90 F.3d 444 (11th Cir.1996); *Westmoreland, Patterson and Moseley v. Painter (In re Painter),* 21 B.R. 846, 848 (Bankr.M.D.Ga.1982) (obligation to pay former spouse's attorney's fees directly to the attorney was nondischargeable).

■ The Court notes that $5,687.98 of the attorney's fee award represents services rendered by Plaintiff's attorney prior to Defendant's bankruptcy. The Court is

persuaded that Defendant's obligation for these prepetition attorney services is not in the nature of alimony, maintenance, or support. The attorney's fee award was not based upon the financial circumstances or the need to balance disparate incomes of Plaintiff and Defendant. The award resulted from Defendant's fraud in refinancing the marital residence in violation of the Temporary Consent Order. The Court is persuaded that Defendant's obligation for the prepetition attorney services in the amount of $5,687.98 is dischargeable.

 The Court notes that $10,942.12 of the attorney's fee award represents postpetition services rendered by Plaintiff's attorney. The Court is persuaded that Defendant's obligation for the attorney services rendered postpetition is not discharged. "Debts arising after the bankruptcy case has commenced are not discharged. See 11 U.S.C. § 727(b)." *In re Rosteck,* 899 F.2d 694, 696 (7th Cir. 1990); *see also Miller v. Miller (In re Miller),* 246 B.R. 559, 562 (Bankr. E.D.Tenn.2000); *Wright v. Moffitt (In re Moffitt),* 146 B.R. 364, 370 (Bankr.S.D.Tex. 1992) (if the activity creating the obligation occurred postpetition, the obligation is not discharged); 11 U.S.C.A. § 727(b) (West 1993) (discharge relieves debtor from all debts that arose prior to the bankruptcy filing, except as provided in 11 U.S.C.A. § 523).

 Plaintiff also contends that Defendant's obligation to reimburse him $3,357 is nondischargeable. Plaintiff and Defendant owed an obligation to the IRS in the principal amount of $14,255.95. The Separation Agreement provided that Plaintiff would make monthly payments of $250 until one-half of the IRS obligation was satisfied. After Plaintiff satisfied his part of the obligation, Defendant was to pay the remainder of the obligation, including any additional penalties and interest. The state court's order entered on February 23, 2001, provides, in part:

In the SEPARATION AGREE-MENT, Item 3c) apportions responsibility for paying joint indebtedness to the Internal Revenue Service. The [Plaintiff] held up his end of this portion of the agreement, but the [Defendant] did not. The [Plaintiff] expended an amount of $3357.00 in excess of his obligation as defined by the agreement. The [Plaintiff] is entitled to reimbursement for those funds.

. . . .

The [Defendant] is ordered to reimburse the amount of $3357.00 to the [Plaintiff] for overpayments he made to the Internal Revenue Service. The [Defendant] is ordered to make this reimbursement to the law offices of Timmons, Haggard & Carney by certified funds on or before 4:30 P.M., March 19, 2001. The [Defendant] is further ordered to make current all obligations to the Internal Revenue Service that she agreed to in the Separation Agreement, and to make such future payments as are contemplated in the SEPARATION AGREEMENT until such time as that obligation is satisfied.

Defendant's obligation to reimburse Plaintiff for payments to the IRS is found in the state court's order entered on February 23, 2001, which enforced the Separation Agreement. The Court notes that the Separation Agreement divided equally between Plaintiff and Defendant the obligation owed to the IRS. The evidence does not show that the division was based upon the financial circumstances or the need to balance disparate incomes of Plaintiff and Defendant. The Court is not persuaded that this division of the IRS obligation was intended to provide support or maintenance. *See Rooker v. Rooker (In re Rook-*

*er)*, 116 B.R. 415, 417 (Bankr.M.D.Pa. 1990). The Court is not persuaded that Defendant's obligation to reimburse Plaintiff is in the nature of alimony, maintenance, or support[16] and is therefore discharged in bankruptcy.

An order in accordance with this memorandum opinion will be entered this date.

---

16. The Court notes that Defendant's obligation to the IRS for tax years 1993, 1994, and 1995 probably is dischargeable in bankruptcy. *See* 11 U.S.C.A. § 507(a)(8) (West Supp.2001); 11 U.S.C.A. § 523(a)(1) (West 1993 & Supp.2001).